Clarence Edward HILL, on behalf of himself and all others similarly situated, Plaintiff,

v.

Robert BUTTERWORTH, etc., and Harry K. Singletary, etc., Defendants.

No. 4:96–cv–288–MMP.

United States District Court, N.D. Florida, Tallahassee Division.

Aug. 7, 1996.

Martin J. McClain, PHV, Stephen M. Kissinger, Pro Hac Vice, Michael J. Minerva, Pro Hac Vice, Office of Capital Collateral Representative, Tallahassee, FL, for Clarence E. Hill.

Carolyn M. Snurkowski, Attorney General's Office, Department of Legal Affairs, Tallahassee, FL, Richard B. Martell, Attorney General's Office, Department of Legal Affairs, Tallahassee, FL, for Robert A. Butterworth, Harry K. Singletary.

## ORDER

PAUL, Chief Judge.

An emergency hearing was held in this matter on July 18, 1996, on Plaintiff's motion for a preliminary injunction (Doc. 6). Plaintiff had filed a brief (Doc. 7) ("*Pl.'s Br.*"), and exhibits (Doc. 15) in support of his motion. At the hearing, Defendants filed a brief and supporting exhibits in opposition to Plaintiff's motion (Doc. 14) ("*Defs.' Br.*").

Plaintiff moves to enjoin Defendants from invoking or asserting, in any state or federal proceeding, that the State of Florida has complied with the so-called "opt-in" provisions of Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, Title I, § 101 *et seq.*, 110 Stat. 1214 (1996) (codified as 28 U.S.C. §§ 2261–66) (*hereinafter "the Act"*). Chapter 154, entitled "Special Habeas Corpus Procedures in Capital Cases," provides for a system of expedited judicial review and other procedural limitations for any State that "opts-in" to the Chapter.[1] A state may opt-in by creating a mechanism for the appointment and funding of competent counsel to represent the State's death-sentenced prisoners in their post-conviction habeas proceedings. According to Plaintiff, the State of Florida has not fully complied with the creation of such an adequate mechanism, and therefore cannot take advantage of the benefits conferred upon opt-in states. Consequently, Plaintiff seeks a judicial determination pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and 42 U.S.C. § 1983, that the system of expedited habeas review may not be applied to either himself or other similarly situated Florida death-row inmates.

As an initial matter, the Court will only consider the present motion for preliminary injunctive relief as to the Plaintiff in his individual capacity. While Plaintiff has included class language in both his complaint and motion for injunctive relief, he has not yet moved for class certification. Absent such a motion and a proper evidentiary basis, the Court cannot determine whether this case should be maintained as a class action. *See* N.D.Fla.Loc.R. 23.1(B).

## I. BACKGROUND:

### A. Procedural history of Plaintiff's habeas petition:

The following facts are drawn from the Supreme Court of Florida's opinion in *Hill v. State*, 643 So.2d 1071 (Fla.1994) (per curiam)

---

1. A more thorough discussion of the Act is contained in Section I(B), *infra*.

("*Hill IV*"), *cert. denied,* —— U.S. ——, 116 S.Ct. 196, 133 L.Ed.2d 131 (1995) [2]:

> In 1983, Plaintiff Clarence Hill was convicted of first-degree murder and sentenced to death for the killing of a police officer during a bank robbery.... On October 19, 1982, [Hill] stole a pistol and an automobile in Mobile, Alabama. Later that day, [Hill] and his accomplice, Cliff Jackson, drove to Pensacola and robbed a savings and loan association at gunpoint. When the police arrived during the robbery, [Hill] fled out the back of the savings and loan building. Jackson exited through the front door, where he was apprehended immediately. [Hill] approached two police officers from behind as they attempted to handcuff Jackson. Testimony established that [Hill] drew his pistol and shot the officers, killing one and wounding the other. A gun battle ensued, during which [Hill] received five bullet wounds.

*Id.* at 1072 (quoting *Hill v. State,* 477 So.2d 553, 554 (Fla.1985) (per curiam) ("*Hill I*")).

The Supreme Court of Florida affirmed Hill's conviction, but ordered a new penalty phase proceeding due to an error that occurred during the jury selection process. *Hill I,* 477 So.2d at 556–57. At resentencing, Hill was again sentenced to death on the basis of the trial judge's determination that there was one statutory mitigating factor (that Hill was 23 at the time of the murder), compared to five aggravating circumstances which included a finding that the murder was cold, calculated, and premeditated. On appeal, the Supreme Court of Florida affirmed, holding that while there was insufficient evidence to support a finding that the murder was cold, calculated, and premeditated, the remaining four aggravating circumstances nonetheless supported imposition of the death penalty. *Hill v. State,* 515 So.2d 176, 179 (Fla.1987) (per curiam) ("*Hill II*"). Hill's motion for post-conviction relief and petition for writ of habeas corpus was then denied in *Hill v. Dugger,* 556 So.2d 1385 (Fla.1990) (per curiam) ("*Hill III*").

In 1990, Hill began the odyssey of seeking federal habeas relief by filing a petition in the United States District Court, Northern District of Florida. *See Hill v. Butterworth,* No. TCA–90–40023–WS (N.D.Fla., pending). In that case, Judge Stafford held that the trial judge erred in finding certain nonstatutory mitigating factors. In addition, Judge Stafford concluded that the Supreme Court of Florida may have erred in its harmless error analysis which invalidated the cold, calculated, and premeditated aggravating factor, without properly considering certain nonstatutory mitigating factors. Therefore, Judge Stafford partially granted Hill's habeas petition.

When the Supreme Court of Florida reopened Hill's direct appeal, it held that death was the appropriate sentence because the statutory and nonstatutory mitigating factors were insufficient to outweigh the four remaining aggravating circumstances. *Hill IV,* 643 So.2d at 1074. On October 2, 1995, the United States Supreme Court denied Hill's petition for writ of certiorari. *Hill v. Florida,* —— U.S. at ——, 116 S.Ct. at 196.

Plaintiff's habeas petition apparently remains pending before Judge Stafford. Plaintiff has not indicated whether he intends to file any new grounds for habeas relief, or otherwise amend the petition he has already filed. In addition, he has not informed the Court about the time frame in which he anticipates final resolution by Judge Stafford of any and all issues that remain in his habeas petition. Plaintiff now seeks this Court's determination about the applicability of Chapter 154 of the Act to his habeas case.

**B. The Act's provisions:**

On April 24, 1996, President Clinton signed the Act into law. Title I of the Act dramatically changes the procedures in federal courts by which state prisoners, particularly those under capital sentence, may raise constitutional claims pertaining to their convictions and sentences. The Act not only modifies Chapter 153 of the Judicial Code, 28

---

**2.** This discussion is merely included to outline the procedural history of Plaintiff's many appeals. It is not intended to otherwise comment on the merits of Plaintiff's pending habeas petition, wherein Plaintiff challenges the basis for his sentence. *See Hill v. Butterworth,* No. TCA–90–40023–WS (N.D.Fla., pending).

U.S.C. §§ 2241–55, but also creates a new set of procedures—Chapter 154, 28 U.S.C. §§ 2261–66—for resolving death-sentenced prisoners' federal habeas corpus cases. The procedures contained in Chapter 154 are specifically designed to "reduce the abuse of habeas corpus that results from delayed and repetitive filings." H.R. REP. No. 23, 104th Cong., 1st Sess. 9 (1995).

■ This legislative intent to curb the protracted proceedings in capital cases is best articulated in the language of the House Report accompanying the Act:

> Subtitle B of Title I of the bill contains a version of the recommendations for capital collateral litigation that were presented in the Report of the Ad Hoc Committee of the Judicial Conference on Federal Habeas Corpus in Capital Cases [45 CRIM.L.REP. (BNA) 3239 (Sept. 27, 1989)] (the "Powell Committee" proposal). While the need for reform extends to all categories of habeas cases, the defects of the current system have had the most extreme effect in capital cases. In such cases, the continuation of litigation means that the sentence cannot be carried out. Hence, capital defendants and their counsel have a unique incentive to keep litigation going by any possible means. In the later stages of review, the most useful means of doing so is by repetitive federal habeas filing. The result of this system has been the virtual nullification of state death penalty laws through a nearly endless review process.

H.R.REP. No. 23, 104th Cong., 1st Sess. 10 (1995). The House Report goes on to describe when states can use the new habeas provisions to remedy these flaws:

> In essence the Powell Committee proposal addresses this problem through a quid pro quo arrangement under which states are accorded stronger finality rules on federal habeas review in return for strengthening the right to counsel for indigent capital defendants. The proposal consists of special capital litigation procedures that would be set out in a new chapter 154 of the Judicial Code. The chapter would apply to capital cases in states that undertake to appoint counsel to represent indigent capital defendants in state collateral proceedings, and to set competency standards for such counsel. This would fill the gap in representation for indigent capital defendants in state proceedings under existing law, since appointment of counsel for indigents is constitutionally required for the state trial and direct appeal.

*Id.*[3] Congress therefore did not intend that the new habeas provisions would necessarily apply to every state, but only those states that "opt-in" to the Act by meeting certain preconditions.[4]

If a state opts in to the new habeas provisions, it receives several procedural benefits. First, petitions for habeas relief under Section 2254 must be filed in federal court within 180 days "after final state court affirmance of the conviction and sentence on direct review or the expiration of the time for seeking such review."[5] 28 U.S.C. § 2263(a). Second, fed-

**3.** In the conference committee's joint explanatory statement, the conferees noted that the provisions for habeas reform contained in Title I were identical in both the Senate and House versions of the Act. The content of both the conferee's statement and the language of the Act itself indicate that Congress intended to impose a quid pro quo arrangement to trigger the new habeas provisions. *See* H.R.CONF.REP. No. 518, 104th Cong., 2d Sess. (1996), *reprinted in* 1996 U.S.C.C.A.N. at 944. *See also* discussion of Chapter 154 of the Act, *infra.* This Circuit has held that "[i]ndications of congressional intent in a conference committee report deserve great deference by courts because 'the conference report represents the final statement of terms agreed to by both houses, [and] next to the statute itself it is the most persuasive evidence of congressional intent.'" *RJR Nabisco, Inc. v. United States,* 955

F.2d 1457, 1462 (11th Cir. 1992) (quoting *Demby v. Schweiker,* 671 F.2d 507, 510 (D.C.Cir.1981)).

**4.** Defendants' argument that there is no "opt-in" requirement to Chapter 154 [*see Hr'g Tr.* at 20–21] is simply belied by the plain language of the Act itself. *See* pages 1135–1136, *infra.* Moreover, the Eleventh Circuit recently alluded to the fact that not all states with unitary or post-conviction procedures would automatically be able to avail themselves of the benefits under Chapter 154. *See Felker v. Turpin,* 83 F.3d 1303, 1305 n. 1 (11th Cir.), *cert. granted,* — U.S. —, 116 S.Ct. 1588, 134 L.Ed.2d 685 (1996).

**5.** The 180 day statute of limitations can be tolled only when certain preconditions have been met. *See* 28 U.S.C. § 2263(b).

eral district courts are limited to only considering "a claim or claims that have been raised and decided on the merits in the State courts."[6] 28 U.S.C. § 2264. Third, adjudication of a petition subject to Chapter 154 must be given priority by the district court and court of appeals "over all noncapital matters." 28 U.S.C. § 2266(a). Fourth, reviewing courts are forced to expedite their review of habeas petitions brought under the Chapter 154.[7] District courts must render a final judgment on a habeas petition within 180 days after the petition is filed, allowing the parties at least 120 of those days to brief the case and have a hearing on the merits.[8] A court of appeals must hear and render a final determination of an appeal within 120 days after the reply brief is filed.[9] 28 U.S.C. § 2266. Fifth, no amendment to a habeas petition subject to Chapter 154 is permitted after the filing of the answer to the petition, except on certain grounds set forth in section 2244(b). 28 U.S.C. § 2266(b)(3)(B).

States may qualify for the foregoing benefits under Chapter 154 if they qualify under one of two "opt-in" procedures: (1) "unitary review" procedures under Section 2265; or (2) "post-conviction" procedures under Section 2261.

A "unitary review" procedure is defined as "a State procedure that authorizes a person under sentence of death to raise, in the course of direct review of judgment, such claims as could be raised on collateral attack." 28 U.S.C. § 2265. The State of Florida does not provide for a "unitary review" process,[10] and the State Defendants conceded as much during oral arguments. Tr. of July, 18, 1996 Hr'g on Mot. for Prelim. Inj. (*hereinafter "Hr'g Tr."*), at 22. Consequently,

the remainder of this discussion on the Act will focus on the requirements for opting in to Chapter 154 through adoption of "post-conviction" procedures.

To qualify for habeas benefits under Section 2261, a state must agree to provide competent counsel and reasonable litigation funding to indigent capital prisoners in its state post-conviction proceedings. Specifically, the Act provides, in relevant part:

(a) This chapter shall apply to cases arising under section 2254 brought by prisoners in State custody who are subject to a capital sentence. It shall apply only if the provisions of subsections (b) and (c) are satisfied.

(b) This chapter is applicable if a State establishes by statute, rule of its court of last resort, or by another agency authorized by State law, a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings brought by indigent prisoners whose capital convictions and sentences have been upheld on direct appeal to the court of last resort in the State or have otherwise become final for State law purposes. The rule of court or statute must provide standards of competency for the appointment of such counsel.

(c) Any mechanism for the appointment, compensation, and reimbursement of counsel as provided in subsection (b) must offer counsel to all State prisoners under capital sentence and must provide for the entry of an order by a court of record—

---

**6.** The only exceptions to this rule are if the failure to raise a particular claim is based upon unlawful state action, the Supreme Court's recognition of a new federal right that applies retroactively, or the existence of a factual predicate that could not have been discovered in time for post-conviction review. 28 U.S.C. § 2264(a).

**7.** A state may enforce the provision by petitioning for a writ of mandamus. 28 U.S.C. §§ 2266(b)(4)(B), (c)(4)(B).

**8.** The 180 day period may be extended by no more than one additional 30–day period, if the district court makes a finding that the ends of

justice that would be served by allowing the delay would outweigh the interests in a speedy disposition of the application. 28 U.S.C. § 2266(b)(1)(C).

**9.** The Act similarly provides for a decision on whether to grant a request for a rehearing or rehearing en banc within 120 after the petition for rehearing or a responsive pleading to the petition is filed. If such rehearing is granted, a final decision must be rendered within 120 days of the order granting the rehearing. 28 U.S.C. § 2266(c)(1)(B).

**10.** *See* discussion *infra* page 1140.

(1) appointing one or more counsels to represent the prisoner under a finding that the prisoner is indigent and accepted the offer or is unable competently to decide whether to accept or reject the offer;

(2) finding, after a hearing if necessary, that the prisoner rejected the offer of counsel and made the decision with an understanding of its legal consequences; or

(3) denying the appointment of counsel upon a finding that the prisoner is not indigent.

(d) No counsel appointed pursuant to subsections (b) and (c) to represent a State prisoner under capital sentence shall have previously represented the prisoner at trial or on direct appeal in the case for which the appointment is made unless the prisoner and counsel expressly request continued representation.

\* \* \* \* \* \*

28 U.S.C. § 2261 (1996). The importance of providing competent counsel for indigent petitioners subject to Chapter 154 is made clear in subsection (e) to Section 2261, which states that "[t]he ineffectiveness or incompetence of counsel during State or Federal post-conviction proceedings in a capital case shall not be a ground for relief in a proceeding arising under section 2254...." As another court reviewing this opt-in provision has noted, "[t]he Act thus seeks to create an incentive for states to provide competent counsel throughout state collateral review, recognizing that such counsel is 'crucial to ensuring fairness and protecting the constitutional rights of capital litigants.'" *Ashmus v. Calderon*, 935 F.Supp. 1048, 1056 (N.D.Cal. June 14, 1996) (footnote omitted) (citations omit-

ted), *appeal filed*, No. 96–16141 (9th Cir. 1996).

## II. DISCUSSION:

 Plaintiff seeks to enjoin Defendants from invoking or asserting, in any state or federal proceeding, that Chapter 154 of the Act is applicable to his petition for writ of habeas corpus. The Plaintiff requests issuance of a temporary restraining order ("TRO"), or alternatively, a preliminary injunction. Under the Federal Rules, a TRO

> may be granted without written or oral notice to the adverse party ... only if (1) it appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party ... can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Fed.R.Civ.P. 65(b). Plaintiff is not entitled to issuance of a TRO because he has filed neither an affidavit accompanying his petition, nor a verified complaint.[11] Moreover, where, as here, the duration of the order will likely be more than 20 days [*see* Fed.R.Civ.P. 65(b) ], and the order will only be issued after notice and a hearing, a district court should construe any request for a TRO as a request for a preliminary injunction. *See Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1421–22 (11th Cir.) (quoting *McDougald v. Jenson*, 786 F.2d 1465, 1472 (11th Cir.1986)), *cert. denied*, —— U.S. ——, 115 S.Ct. 2578, 132 L.Ed.2d 828 (1995), and *cert. denied*, —— U.S. ——, 116 S.Ct. 299, 133 L.Ed.2d 205 (1995).[12] Consequently, the in-

---

11. A court is to treat a verified complaint as the functional equivalent of an affidavit, to the extent the complaint satisfies the standards outlined in the Federal Rules of Civil Procedure. *E.g., Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir.1995); *Munz v. Michael*, 28 F.3d 795, 798 (8th Cir.1994); *Barker v. Norman*, 651 F.2d 1107, 1114–15 (5th Cir. Unit A July 1981). "Verification" is defined as "confirmation of correctness, truth, or authenticity, by affidavit, oath, or deposition." *Neal v. Kelly*, 963 F.2d 453, 457 (D.C.Cir.1992) (quoting Black's Law Dictionary 1400 (5th ed. 1979)). In the case sub judice,

Plaintiff has neither signed his complaint, nor otherwise shown that the statements therein were made under oath under penalties of perjury. *See* Fed.R.Civ.P. 56(e); 28 U.S.C. § 1746. Consequently, Plaintiff has not verified his complaint.

12. Other factors that weigh in favor of construing a request as one for a preliminary injunction include the extent of evidence submitted to the district court, and the continuing safeguards installed by the district court. *Cuban Am. Bar Ass'n*, 43 F.3d at 1422.

junctive relief to which Plaintiff is now entitled, if any, is limited to a preliminary injunction.

■ A preliminary injunction "is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion.'" *Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir.1985) (quoting *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983)). To prevail in its motion for a preliminary injunction, Plaintiff has the burden of proving: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) their own injury outweighs the injury to Defendants; and (4) the injunction would not disserve the public interest. *Cuban Am. Bar Ass'n,* 43 F.3d at 1424. *Cf. Ingram v. Ault,* 50 F.3d 898, 900 (11th Cir. 1995) (same requirements for a TRO). Failure of Plaintiff to demonstrate one of these elements requires this Court to deny Plaintiff's motion for a preliminary injunction. *Cafe 207, Inc. v. St. Johns County,* 989 F.2d 1136, 1137 (11th Cir.1993). Each of these elements will be addressed separately.

## A. Substantial likelihood of success on the merits:

Defendants raise several grounds upon which they argue that Plaintiff has no substantial likelihood of success on the merits. First, they maintain that Plaintiff lacks standing to bring the present cause. Second, they assert that Plaintiff has failed to demonstrate the existence of a case or controversy, depriving the Court of jurisdiction. Third, they conclude that even if Plaintiff's cause was properly before the Court, Plaintiff's interpretation of the applicability of Chapter 154 of the Act to the State of Florida is incorrect. The Court believes that Defendants' arguments cut to the heart of whether Plaintiff is likely to prevail on the merits, and will tailor its analysis accordingly.

### 1. Plaintiff's standing:

■ The central purpose of the standing requirement is "to ensure that the parties before the court have a concrete interest in the outcome of the proceedings such that they can be expected to frame the issues properly." *Harris v. Evans,* 20 F.3d 1118, 1121 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 641, 130 L.Ed.2d 546 (1994). Standing is comprised of two separate and distinct inquiries: whether the party in question has constitutional standing under Article III of the United States Constitution; and if so, whether the party in question can get past "prudential" limitations on the court's exercise of its judicial power. When plaintiffs have moved for a preliminary injunction and have had little opportunity to present evidence or argument, "the plaintiffs' standing should be judged on the sufficiency of the allegations of the complaint, with any preliminary hearing evidence favorable to the plaintiffs on standing treated as additional allegations of the complaint." *Church v. City of Huntsville,* 30 F.3d 1332, 1336 (11th Cir.1994).

■ In order to have constitutional standing, the Plaintiff must meet three requirements. First, he must have suffered an "injury in fact"—in other words, violation of a "legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and conduct complained of.... Third, it must be likely that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Johnson v. Mortham,* 915 F.Supp. 1529, 1539 (N.D.Fla.1995) (three judge panel) (quoting same).

■ There are also certain "prudential" limitations on standing: the plaintiff's complaint must fall within the zone of interest protected by the statute or constitutional provision at issue, raise more than abstract questions amounting to generalized grievances, and assert the plaintiff's own legal rights and interests rather than those of a third party. *E.g., Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975); *Saladin v. City of Milledgeville,* 812 F.2d 687, 690 (11th Cir.1987).

Defendants apparently contend that Plaintiff has failed to demonstrate an injury in fact, instead relying upon potential injuries

suffered by third parties. Defendants state that the focus of Plaintiff's complaint and request for injunctive relief is the "uncertainty" of inmates who have not yet filed habeas petitions. Defendants aver that Plaintiff is attempting to avoid a showing of individualized harm, by relying upon the possible claims of these other inmates. Since Plaintiff presently has a habeas petition pending in federal court "and no party has asserted that he has run afoul of any provision of the Antiterrorism Act, or that any claim of his is barred thereby," Defendants conclude that Plaintiff's motion should be denied and his complaint dismissed. *Defs.' Br.*, at 5–6.

■ To the extent that the Defendants' argument pertaining to the injury in fact component requires resolution of whether this action is ripe for review, that argument is addressed in the next section.[13]

As to the question of whether the Plaintiff has alleged that he has personally suffered (or will suffer) injury if the requested relief is not granted, the Court finds that Plaintiff has demonstrated the requisite individualized harm. Plaintiff suffers from an actual injury because Defendants have asserted in these proceedings [*see Defs.' Br.*, at 7–9; *Hr'g Tr.* at 22–25], and apparently will continue to assert absent judicial relief, that the new habeas provisions contained in Chapter 154 apply to Plaintiff's pending habeas petition. Although Plaintiff has already filed a habeas petition, the uncertainty of whether Chapter 154 applies to his cause will still force him to choose between either: (1) complying with that Chapter and sacrificing procedural rights he might otherwise have if the State of Florida has in fact not opted into Chapter 154; or (2) not complying with that Chapter, thereby sacrificing his procedural rights under the Chapter if the State of Florida has in

fact opted into it.[14] As a result, the pleadings and information adduced during oral arguments show that Plaintiff has constitutional standing, and the Court holds that there are no prudential limitations that weigh against exercising jurisdiction over Plaintiff's claim.

### 2. Existence of a case or controversy/ripeness:

■ Article III of the Constitution restricts a federal court's jurisdiction to actual "cases" or "controversies." The Eleventh Circuit has stated that determining whether this constitutional requirement is met in the context of a request for relief pursuant to the Declaratory Judgement Act, boils down to the following: "whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *GTE Directories Pub. Corp. v. Trimen Am., Inc.*, 67 F.3d 1563, 1567 (11th Cir.1995). A party therefore cannot show a viable case or controversy where he or she is merely asking for an advisory opinion. *Miller v. FCC*, 66 F.3d 1140, 1146 (11th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1543, 134 L.Ed.2d 647 (1996). When a party seeks a declaratory judgment, a case or controversy must exist at the time the action is filed. *Trimen*, 67 F.3d at 1567.

Defendants agree with Plaintiff that the parties have taken different views on the applicability of Chapter 154, and that they have adverse legal interests intertwined with those views. *See Defs.' Br.*, at 7. Nevertheless, Defendants dispute the existence of a substantial controversy. Instead, Defen-

---

13. The Eleventh Circuit recently discussed the important difference between standing and ripeness. *See Wilderness Soc'y v. Alcock*, 83 F.3d 386 (11th Cir.1996). Both doctrines require "actual or imminent" type of injury to the persons in question. However, "[w]hen determining standing, a court asks whether these persons are proper parties to bring the suit, thus focusing on the qualitative sufficiency of the injury and whether the complainant has personally suffered harm." On the other hand, "[w]hen determining ripeness, a court asks whether this is the correct time

for the complainant to bring the action." *Id.* at 390 (internal citation omitted).

14. Thus, to the extent that Plaintiff can still file a new habeas petition, he will not know the time frame within which to make such a filing, or otherwise what specific procedures will control. Moreover, even if Plaintiff chooses not to file a new petition, he will not know whether he can amend the petition he has pending before Judge Stafford.

dants maintain that Plaintiff merely seeks an advisory opinion:

> MR. MARTELL: The consequences of the Act's implications in Florida are a different question from whether or not Florida qualifies for the Act. And when my opponent was discussing these scenarios, they were all prefaced with "If." If this happens. If this is construed this way. If this is found this way. If a court does or does not do that. That is speculative.
>
> In order to get the relief that he needs, he needs actual and imminent harm of an irreparable kind. He doesn't have that. Assuming that the Act went into effect in Florida on the day it was enacted, no one is out of time. The six month time for filing has not run for anyone. All persons arguably within this class still have options of filing additional pleadings in state court, which would toll the time for their federal habeases to be filed.

*Hr'g Tr.* at 19. As a result, Defendants conclude that there is no "case" or "controversy" to allow this Court to consider Plaintiff's motion for preliminary injunctive relief.

■ In evaluating whether Plaintiff's claim is ripe for review, the question turns on "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

■ The first part of the *Abbott Labs* test, fitness, requires the issues be focused sufficient for a reviewing court to be able to conduct a proper inquiry. The present motion presents a simple question of law—namely, whether the State of Florida has opted into Chapter 154—that will not be enhanced by delaying review for further fac-

tual development.[15] Under such circumstances, the issues are sufficiently focused. *See, e.g., Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983); *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634–35, 57 L.Ed.2d 595 (1978); *Whitney v. Heckler,* 780 F.2d 963, 969 n. 6 (11th Cir.), *cert. denied,* 479 U.S. 813, 107 S.Ct. 65, 93 L.Ed.2d 23 (1986).

The second part of the *Abbott Labs* test, hardship, requires the Court to examine the hardship that Plaintiff might suffer absent judicial review.[16] *Pacific Gas,* 461 U.S. at 201 & n. 13, 103 S.Ct. at 1720–21 & n. 13. In the case sub judice, if the Court does not act, Plaintiff will be deprived of the ability to make informed decisions on how to proceed in his habeas action because he will be uncertain about what procedures control. More specifically, Plaintiff must know if Chapter 154 applies to his case so he can determine the following: whether he can amend his petition pending before Judge Stafford; whether he can file any unexhausted claims; whether he must file any new claims within 180 days of the effective date of the Act; what other time limits apply to his petition, including limitations on conducting evidentiary inquiries and filing of briefs; and whether he can raise ineffectiveness or incompetence of post-conviction counsel in a later proceeding. The uncertainty of not knowing which procedures govern Plaintiff's habeas petition will also make it difficult, if not impossible, for Plaintiff's collateral counsel to litigate the habeas petition effectively on Plaintiff's behalf. Consequently, the Plaintiff stands to suffer immediate and irremedial hardship.

■ The fact that certain contingencies may be involved—e.g., whether Plaintiff in

---

15. Indeed, Defendants' counsel recognized as much during oral arguments by stating, "[w]hether Florida qualifies to take advantage of the time limits is simply a question, *a legal question, for a court to decide." Hr'g Tr.* at 21 (emphasis added). To the extent that Defendants' counsel argued that this is not the appropriate forum to decide this question, the remainder of this discussion shows counsel is mistaken.

16. In assessing this factor, the Court need not be concerned solely with whether refusing Plaintiff declaratory relief will actually impose a hardship. Instead, "[t]he key question involves the usefulness of a declaratory judgment, that is, the extent to which the desired declaration 'would be of practical assistance in setting the underlying controversy to rest.'" *Ernst & Young v. Depositors Economic Protection Corp.,* 45 F.3d 530, 537 (1st Cir.1995) (citation omitted).

fact takes particular courses of action in his habeas proceedings—is not fatal.[17] The law is well-established that "an issue is ripe for judicial review when the challenging party is placed in the dilemma of incurring the disadvantages of complying or risking penalties for noncompliance." *Whitney*, 780 F.2d at 969 n. 6. *Cf. New York v. United States*, 505 U.S. 144, 175, 112 S.Ct. 2408, 2428, 120 L.Ed.2d 120 (1992); *Pacific Gas*, 461 U.S. at 201, 103 S.Ct. at 1721; *Regional Rail Reorganization Act Cases ("Rail Cases")*, 419 U.S. 102, 144–45, 95 S.Ct. 335, 339, 42 L.Ed.2d 320 (1974); *Abbott Labs*, 387 U.S. at 153, 87 S.Ct. at 1518.

 This conclusion is likewise not altered by the fact that the 180 day statute of limitations under Chapter 154 will not run until later this year.[18] "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Rail Cases*, 419 U.S. at 143, 95 S.Ct. at 358 (collecting cases). In fact, Defendants are simply mistaken in their assertion that any consequences Plaintiff will suffer if Chapter 154 applies will not occur until the 180 day filing deadline expires. If Chapter 154 applies to Plaintiff, he will have to immediately and significantly change his conduct in accordance with the new habeas procedures, "with serious penalties attached to noncompliance." *Abbott Labs*, 387 U.S. at 153, 87 S.Ct. at 1518. Plaintiff's declaratory judgment action is therefore ripe for review. *Cf. Lujan v. National Wildlife Federation*, 497 U.S. 871, 891–92, 110 S.Ct. 3177, 3190, 111 L.Ed.2d 695 (1990) (agency action is ripe for review at

once, where "a substantive rule ... as a practical matter requires the plaintiff to adjust his conduct immediately"); *Florida League of Professional Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 459 (11th Cir.1996) (action challenging constitutionality of state lobbying statute was ripe even where no lobbyists had been prosecuted under it, since plaintiffs faced "unattractive" options of either sacrificing their First Amendment rights or facing sanctions). *Accord, Riva v. Massachusetts*, 61 F.3d 1003, 1012 (1st Cir. 1995); *Browning–Ferris v. Alabama Dep't of Envtl. Mgmt.*, 799 F.2d 1473, 1480–81 (11th Cir.1986).

In summary, for all the foregoing reasons, the Court finds that there is a justiciable case or controversy underlying the instant motion for preliminary injunctive relief. While the difference between an abstract advisory opinion and a case or controversy is necessarily "one of degree,"[19] the Court finds a substantial basis to conclude that Plaintiff is seeking to avoid actual or imminent injury to himself in his habeas proceedings.

### 3. Has Florida "opted in" to the Act?:

The parties seem to be in agreement that Florida has a "post-conviction" type of system for the review of capital convictions and sentences that have been made final for purposes of state law. Florida law supports this view. The Florida Rules of Criminal Procedure create a system for seeking post-conviction relief only after direct appeal is final. *See, e.g.*, Fla.R.Crim.P. 3.850(a) (stating general ground for post-conviction motion that "the judgment or sentence is otherwise sub-

---

**17.** *See generally Sandell v. FAA*, 923 F.2d 661, 664 (9th Cir.1990) ("At times, as here, common sense indicates that review should be afforded even though ultimate injury to the complaining party depends on the occurrence of other events.").

**18.** The effective date of the Act was April 24, 1996, when it was signed into law by President Clinton. *See generally* Pub.L. No. 104–132, Title I, § 107(c), 110 Stat. at 1226 ("Chapter 154 of title 28 ... shall apply to cases pending on or after the date of enactment of this Act."). Courts addressing the applicability of Title I of the Act have held it does not apply retroactively. *See,*

*e.g., United States v. Barnett*, No. 96–C–1274, 1996 WL 400016, at *2 (N.D.Ill. July 15, 1996); *Breard v. Angelone*, 926 F.Supp. 546, 547–48 (E.D.Va.1996); *Ashmus*, 935 F.Supp. at 1061 n. 14. (collecting additional citations). As a result, even if the procedural limitations contained in Chapter 154 apply to Plaintiff, the 180 day period would not have commenced until April 24, 1996.

**19.** *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979); *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

ject to collateral attack"); Fla.R.Crim.P. 3.850(c) (stating that "[t]his rule does not authorize relief based on grounds that could have or should have been raised ..., if properly preserved, on direct appeal of the judgment and sentence"). Furthermore, the statute creating the office of Capital Collateral Representative ("CCR"), contained in Part IV of Florida Statutes, Chapter 27, specifically provides for "the collateral representation of any person convicted and sentenced to death in this state, so that *collateral legal proceedings* to challenge any Florida capital conviction and sentence may be commenced...." Fla.Stat. § 27.7001 (1996) (emphasis added). As a result, if Florida may take advantage of Chapter 154 of the Act, it may only do so if it meets all the requirements for "post-conviction" procedures.

States seeking to qualify under the "post-conviction" route must do several things: (1) establish by statute or rule a mechanism for appointment of counsel for post-conviction proceedings brought by all capital prisoners; (2) ensure that appointed counsel are competent; (3) pay appointed counsel reasonable litigation expenses; and (4) offer counsel to all capital prisoners seeking post-conviction relief, with actual appointment of counsel occurring upon a determination that the capital prisoner is indigent and has accepted the offer. *See* 28 U.S.C. § 2261. Failure to meet any one of these requirements would prevent a state from having qualifying "post-conviction" procedures.

Preliminarily, the Court agrees with Defendants that the State of Florida has established a comprehensive statutory framework for appointment of counsel in post-conviction proceedings brought by all capital prisoners. In its last session, the Florida Legislature made several changes to Florida Statutes Chapter 27, in an apparent attempt to conform the language of its post-conviction procedures to that of the Act. *See* 1996 Fla. Sess. Law Serv. ch. 96–290 (West).[20] Section 27.7001 was amended by taking out language that collateral counsel was to be offered to only indigent capital prisoners, and making such counsel available to "any" capital prisoner seeking collateral review. Fla.Stat. § 27.7001. Other sections were similarly modified. *Cf.* Fla.Stat. § 27.702 (capital collateral representative "shall represent ... *each person* convicted and sentenced to death in this state in collateral postconviction proceedings, unless a court appoints or permits other counsel to appear") (emphasis added); Fla.Stat. § 27.703 (requiring appointment of other members of Florida Bar to represent such persons, when capital collateral representative is conflicted out).

Notwithstanding these statutory changes, Plaintiff makes several arguments to support his conclusion that Florida has not fully complied with the post-conviction requirements set forth in the Act. The Court will address these arguments under two broad categories: (1) competency of appointed counsel; and (2) offer of counsel.

### a. Competency of counsel:

Under Chapter 154 of the Act, "[a] rule of court or statute must provide standards of competency" for post-conviction counsel. 28 U.S.C. § 2261(b). Plaintiff asserts that Florida's post-conviction scheme fails to abide by this requirement in several respects. Most of Plaintiff's arguments are meritless.[21] The Court will therefore limit

---

20. Section 11 of this act stated it "shall take effect upon becoming a law." 1996 Fla. Sess. Law Serv. ch. 96–290, at sec. 11. The act became a law without the Governor's approval on May 30, 1996.

21. For example, Plaintiff disingenuously points out through his CCR counsel that even to the minimal extent that Florida sets competency standards in Florida Statutes Section 27.704 for the hiring of CCR counsel, CCR has blatantly circumvented those standards. *See Pl.'s Br.* at 15–16. This argument does not help Plaintiff's cause, since CCR's lack of institutional integrity in abiding by the undemanding standards presently in force casts grave doubt as to whether CCR would abide by *any* standards—including those that satisfy Chapter 154.

Plaintiff also claims that recent limitations placed upon the types of services provided by CCR, including restrictions on public records requests and exclusion of CCR from seeking clemency for capital prisoners, preclude CCR from serving as "competent" counsel. The Court rejects this argument. The 1996 amendment to Florida's public records law does not prevent capital prisoners from obtaining public records, but only from using the law as a means to improperly extend discovery or otherwise pro-

its discussion solely to Plaintiff's most persuasive contention.

Plaintiff asserts that Florida does not have the requisite competency standards. *Pl. Br.*, at 17. Defendants respond by stating that the Supreme Court of Florida has been vigilant in its oversight of collateral representation, thereby ensuring the competency of such representation. As support for their argument, Defendants cite to the Supreme Court of Florida's decisions in *Spalding v. Dugger*, 526 So.2d 71, 72 (Fla.1988), and *Spaziano v. State*, 660 So.2d 1363 (Fla.1995), *cert. denied,* — U.S. —, 116 S.Ct. 722, 133 L.Ed.2d 674 (1996). *Defs.' Br.*, at 8–9.

██ Currently, there are only two Florida provisions that suggest any standards of competency, as required by Chapter 154. To qualify for appointment as the State Capital Collateral Representative, an individual must have been a member of the Florida Bar for at least five years. *See* Fla.Stat. § 27.701. On the other hand, full-time assistant capital collateral representatives must be "members in good standing of The Florida Bar with not less than 2 years experience in the practice of criminal law." Fla.Stat. § 27.704(1). There is no additional requirement that either the Capital Collateral Representative or his or her assistant representatives, have any degree of specialization or skill in the arena of habeas proceedings. Moreover, when CCR is conflicted out of a case, there is no provision for any degree of competence or experience for substitute counsel. *See* Fla. Stat. § 27.703.

Two other courts have found that similar shortcomings in other state appointment schemes, precluded those states from qualifying under the "opt-in" provisions of Chapter 154. In *Ashmus*, the court expressly held that competency standards sufficient to satisfy Chapter 154 should "require counsel to have ... experience or competence in raising collateral issues." 935 F.Supp. at 1072. *See*

*also id.* at 55–57, at 1074–75 (finding that California failed to include such a requirement). Similarly, in *Austin v. Bell*, 927 F.Supp. 1058 (M.D.Tenn.1996), the court held that merely requiring that appointed capital post-conviction counsel be a member of the state bar did not satisfy the competency requirement of Chapter 154. The *Austin* court reasoned:

> It is crucial under the Act that only qualified attorneys be appointed to represent habeas petitioners in capital cases because the Act does not permit the ineffectiveness or incompetence of counsel during State or Federal post-conviction proceedings to be grounds for relief in a proceeding arising under section 2254. Instead, such incompetence may only result in the appointment of different counsel on the motion of the state or the petitioner. 28 U.S.C. § 2261(e).

*Id.* at 1062. Since Tennessee law did not sufficiently ensure the competency of collateral counsel, the *Austin* court concluded that Chapter 154 of the Act did not apply to Tennessee. *Id.*

The Court agrees with this analysis. Simply requiring assistant capital collateral representatives to "be members in good standing of the Florida Bar with not less than two (2) years experience in the practice of criminal law" is not an adequate standard of competency for purposes of "opting-in" to Chapter 154. The plain language of 28 U.S.C. § 2261 contemplates counsel who are competent through capital, post-conviction experience. *See* 28 U.S.C. § 2261(b) (state mechanism must provide for "competent counsel in State *post-conviction* proceedings [and] ... [t]he rule of court or statute must provide standards for the appointment of *such* counsel") (emphasis added). *See also* 137 CONG. REC. S3220 (daily ed. March 13, 1991) ("At a minimum, ... these states [must] focus on an[d] articulate standards of competence for such" collateral proceedings).[22] This re-

---

tract post-conviction proceedings. *See* Fla.Stat. § 119.07(9) (1996). Similarly, Florida law expressly provides for appointment of the public defender or other attorney not employed by CCR to represent an indigent in an executive proceeding for clemency. *See* Fla.Stat. § 925.035(4); *State v. Remeta*, 547 So.2d 181, 181–82 (Fla. 5th

DCA 1989), *quashed on other grounds*, 559 So.2d 1132 (Fla.1990).

**22.** Although the Senate statement is referring to habeas corpus reform legislation proposed in 1991, the relevant portions of the proposed 1991 Act are identical to the legislation signed into law

quirement seems to be similar to the standard of "qualified legal counsel" set forth in the Anti–Drug Abuse Act of 1988, 21 U.S.C. Section 848. *Cf.* 21 U.S.C. § 848(q)(6) (at least one counsel appointed to represent indigent capital prisoner in federal post-conviction proceedings "must have been admitted to practice in the court of appeals for not less than five years, and must have had not less than three years experience in the handling of appeals in that court in felony cases"). *See also McFarland v. Scott,* 512 U.S. ——, —— & n. 2, 114 S.Ct. 2568, 2571 & n. 2, 129 L.Ed.2d 666 (1994) (noting that § 848 sets standard for "qualified legal counsel" in federal post-conviction proceedings).

The absence of the requisite competency standards is not remedied merely because the Supreme Court of Florida regulates the adequacy of CCR's representation. In fact, the Supreme Court of Florida, like the highest courts of most (if not all) other states in the United States, ultimately supervise the quality of representation provided by members of the state bar. However, a plain reading of Section 2261(b) indicates that Congress wanted more than the general supervision of a state high court. Instead, a specific mechanism for competent counsel representing indigents in *all* post-conviction capital proceedings has to be established. *Spalding,* cited by Defendants, is inapposite because it simply holds that the capital collateral representative may "assert in *individual* cases his claims of inability to provide effective assistance of counsel." 526 So.2d at 73 (emphasis added). No where does it refer to a system-wide set of competency standards. *Spazi-*

*ano,* also cited by Defendants, has no relevance to the present inquiry.

The Eleventh Circuit has recognized that "[c]apital habeas cases present district courts with complex and sometimes novel issues in subjects such as procedural default, cause and prejudice, and retroactivity." *Hill v. Jones,* 81 F.3d 1015, 1021 (11th Cir.), *reh'g and reh'g en banc denied,* 92 F.3d 1202 (1996). *Cf. Lonchar v. Thomas,* —— U.S. ——, —— – ——, 116 S.Ct. 1293, 1298–99, 134 L.Ed.2d 440 (1996) (discussing the importance of imposing standards governing disposition of habeas applications before district courts because of the complex issues involved) (citing *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)).[23] Commentators agree with this assessment.[24] It is axiomatic that the complexity of habeas proceedings "makes it unlikely that capital defendants will be able to file successful petitions for collateral relief without the assistance of persons *learned in the law.*" *McFarland,* 512 U.S. at ——, 114 S.Ct. at 2572 (emphasis added) (quoting *Murray v. Giarratano,* 492 U.S. 1, 14, 109 S.Ct. 2765, 2772, 106 L.Ed.2d 1 (1989) (Kennedy, J., joined by O'Connor, J., concurring in the judgment)). *See also Lonchar,* —— U.S. at ——, 116 S.Ct. at 1302 (recognizing "the common practice of substituting *specialized capital counsel* for habeas" petitions filed by capital defendants) (emphasis added). Section 2261 reflects this line of thinking.

Consequently, since the State of Florida does not have a statute or rule with a mechanism for ensuring "competent counsel in

---

by President Clinton in April 1996. *See Ashmus,* 935 F.Supp. at 1056 n. 6.

**23.** *See also* Robert L. Shevin, Supreme Court of Florida, Study of the Capital Collateral Representative (Feb. 26, 1996) (*hereinafter "Shevin Report"*, provided as Attachment A to this opinion), wherein former Attorney General Shevin noted:

Florida and federal death penalty jurisdiction is complex and rapidly evolving. This fact was recognized by all the sources I consulted. The complexity of death penalty jurisprudence is evidenced by the delay in trial court rulings on [Florida Rule of Criminal Procedure] 3.850 motions, and the difficulty in retaining volunteer counsel.

*Id.* at 17–18.

**24.** *E.g.,* Donald P. Lay, *The Writ of Habeas Corpus: A Complex Procedure for a Simple Process,* 77 Minn.L.Rev. 1015 (1993). *See generally* Michael Millemann, *Capital Post–Conviction Petitioners' Right to Counsel: Integrating Access to Court Doctrine and Due Process Principles,* 48 Md.L.Rev. 455, 487 (1989) (capital punishment doctrine includes "some of the most complicated, dynamic, and at times inconsistent bodies of law that exist"); 141 Cong.Rec. S4593 (daily ed. Mar. 24, 1995) (statement of Sen. Specter) ("Federal habeas corpus is a complex and arcane subject. Its difficult and restrictive rules simply delay imposition of the death penalty and render it useless as a deterrent.").

State post conviction proceedings" is appointed for indigent capital defendants, it cannot qualify as an "opt-in" state under Chapter 154 of the Act. *See* 28 U.S.C. § 2261(b). Clearly "[p]roviding *competent* counsel to represent death-sentenced individuals in postconviction [sic] proceedings is a necessary part of assuring a fair, prompt, and reliable outcome." *Shevin Report* at 20 (emphasis in original). *See also Remeta v. State,* 559 So.2d 1132, 1135 (Fla.1990) ("The appointment of counsel in any setting would be meaningless without some assurance that counsel give *effective* representation.") (emphasis added).

### b. Offer of counsel:

Chapter 154 of the Act also requires that a state have "a mechanism for the appointment, compensation, and payment of reasonable litigation expenses" of post-conviction counsel [28 U.S.C. § 2261(b)], and that an offer of such counsel must be made "to all State prisoners under capital sentence" [28 U.S.C. § 2261(c)]. As discussed below, it is uncertain whether Florida has provided adequate funding and allocation of resources for post-conviction counsel. However, the crux of Plaintiff's argument is that the large number of indigent capital prisoners who have accepted Florida's offer of counsel, but have not yet been provided counsel (for whatever reason), also demonstrates that Florida has not opted in to Chapter 154. The Court concurs with this assessment.[25]

Since its creation in 1985, the Office of Capital Collateral Representative has precipitated several confrontations with the Supreme Court of Florida and the Florida Legislature over its supposed inability to provide counsel to indigents in post-conviction proceedings, due to inadequate funding. In 1988, CCR petitioned the Supreme Court of Florida for writ of mandamus or prohibition to stay all proceedings of capital defendants represented by CCR, until additional funds were allocated to CCR. *See Spalding,* 526 So.2d at 71–72. The petition was denied.

*Id.* at 73. Similarly, in 1995, CCR asserted it could not provide effective assistance of counsel in post-conviction proceedings because it was "overworked and forced to labor under severe time constraints." *White v. Singletary,* 663 So.2d 1324, 1325 (Fla.), *cert. denied,* — U.S. —, 116 S.Ct. 591, 133 L.Ed.2d 505 (1995). The Supreme Court of Florida again rejected this argument. *See White,* 663 So.2d at 1325.

In June, 1995, Michael Minerva, the head of CCR, sought relief from Florida's new one-year deadline for filing post-conviction motions in capital cases. *See* Fla.R.Crim.P. 3.851. Mr. Minerva also stopped designating counsel to represent death row inmates whose one-year deadline had started running (some forty cases), in large part because of the Supreme Court of Florida's affirmance in 1994 of 46 new death penalty cases—twice the historical average. The Supreme Court of Florida denied CCR's motion for relief, but designated former Florida Attorney General Robert L. Shevin to determine whether CCR had the resources to handle any additional cases. *Shevin Report* at 1–2.

Mr. Shevin recognized several factors beyond CCR's control that were contributing to its inability to timely file post-conviction motions in compliance with Rule 3.851. For example, on March 1, 1996, federal funding for the Volunteer Lawyers' Resource Center ("VLRC") was terminated. The VLRC had provided representation (through the assistance of volunteer lawyers) to 41 death row inmates, 19 of which were "conflict cases" that could not be represented by CCR. *Id.* at 6–7. In addition, CCR itself historically had been underfunded and understaffed to deal with burgeoning case loads. *See id.* at 7–9. This deficiency became especially clear when the number of death prisoners seeking post-conviction relief doubled in 1996. *Id.* at 9. Furthermore, the absence of a formal discovery mechanism for Rule 3.850 motions, tended to further delay the filing of those motions. *Id.* at 14–15. Finally, lack of fund-

---

25. The Court's preliminary finding that Florida does not provide the competency standards contemplated by the Act is a sufficient basis, by itself, to conclude that Florida has not opted in to Chapter 154. Nevertheless, the Court is cognizant that there will likely be further review of this decision. Therefore, the Court will engage in a complete analysis of the parties' remaining arguments.

ing to establish CCR branch offices,[26] caused CCR to waste substantial hours of attorney and investigator time in travel throughout the rest of Florida. *Id.* at 15–16.

CCR itself has also been partly responsible for its inability to keep up with the post-conviction workload. Mr. Shevin recognized that only 11 of CCR's 20 attorneys were designated as "lead counsel," and even among those attorneys there was a significant disparity in case assignments. *See id.* at 10–13. CCR was also criticized for its litigation tactic of raising issues that were procedurally barred, meritless, or otherwise foreclosed by controlling law.[27] *Id.* at 16. The *Shevin Report* further noted that "CCR lawyers believe that they must raise all legal issues" through "170–page motions that create unnecessary delays."[28] *Id.* at 16–17. A recent newspaper account also recognizes CCR's abusive use of last-minute public records requests as yet another means to delay executions. *See* Debbie Salamone, *Justices Pushing Rule to Speed up Death Row Appeals: They Think Appeal Attorneys are Stalling When They Make Late Requests for Public Records,* ORLANDO SENTINEL, Apr. 27, 1996, at C3.

The *Shevin Report* suggested several steps to remedy these problems, including: requiring by court order that CCR assign counsel for undesignated cases, with at least four cases being assigned each month until the backlog is eliminated[29]; requesting that the Florida Legislature provide additional funding of between $750,000 and $1 million to create a VLRC-type program to take over the 41 cases formerly handled by VLRC; changing Florida Statutes Chapter 119, Florida's public records law, to expedite discovery requests made by CCR; requiring CCR attorneys to keep time records, to facilitate evaluation of CCR's workload capability; and mandating that CCR alter its vexatious post-conviction tactics. *See Shevin Report* at 21–24.

The Supreme Court of Florida and the Florida Legislature adopted many of these recommendations. CCR was given funding for additional positions, including two attorneys who would act as conflict counsel.[30] *Hr'g Tr.* at 12–14. Florida's public records law was amended to prevent misuse of public records requests as a means to protract habeas proceedings.[31] *See* Fla.Stat. § 119.07. The Supreme Court of Florida also began ordering CCR to assign counsel for capital

---

**26.** Florida Statutes Section 27.701 provides that the principal office of CCR "shall be located in Tallahassee." CCR does not have any other offices. *Shevin Report* at 15.

**27.** The Supreme Court of Florida has criticized CCR for similar reasons. *See, e.g., Williamson v. Dugger,* 651 So.2d 84, 86–87 (Fla.1994), *cert. denied,* ── U.S. ──, 116 S.Ct. 146, 133 L.Ed.2d 91 (1995).

**28.** Unfortunately, the Court is all too familiar with this "everything but the kitchen sink" mentality. CCR's 267–page "brief" in *Williamson v. Singletary,* Case No. 95–10056 (N.D.Fla., pending), is a typical example of a counter-productive work product, which tends to bury potentially meritorious claims in a plethora of frivolous or procedurally barred arguments. Such filings also undermine the integrity of the judicial process by serving as yet another means of unnecessary delay. *See generally Buenoano v. Singletary,* 74 F.3d 1078, *reh'g and reh'g en banc denied,* 85 F.3d 645 (11th Cir.1996), wherein the court opined:

> Buenoano's habeas petition contains 21 claims and is 275 pages long. It reads as if it is both a petition and a brief. Many of the claims in the petition are characterized by conclusory

references to reported decisions. This practice, which has become common, is not contemplated either by the habeas rules or the civil rules and makes it difficult for courts to identify discrete claims in a petition. We expressly disapprove of this practice.

74 F.3d at 1081 n. 1. *Cf. Spaziano v. Singletary,* 36 F.3d 1028, 1031 n. 2 (11th Cir.1994) (striking CCR's habeas petition for failure to comply with court rule 2(c), observing that "[a]ttorneys who cannot discipline themselves to write concisely are not effective advocates"), *cert. denied,* ── U.S. ──, 115 S.Ct. 911, 130 L.Ed.2d 793 (1995).

**29.** This schedule was conditioned upon increased funding of $730,000 for 14 new positions (including six additional attorneys), higher CCR salaries to increase the level of experience of CCR attorneys, and funding for branch offices. *Shevin Report* at 22.

**30.** Plaintiff represents that the increased funding was lapsed until October 1, 1996. *Pl.'s Br.* at 8, 20; *Hr'g Tr.* at 14.

**31.** It does not yet appear that formal discovery standards have been established in Rule 3.220, Florida Rules of Criminal Procedure, for public records requests in habeas proceedings.

defendants without representation in post-conviction proceedings, at the rate of four a month. *See* Ex. 2 to *Pl.'s Br.*

Notwithstanding these improvements, Florida still has a substantial backlog of unassigned indigent defendants seeking post-conviction relief. *See generally* Jackie Hallifax & Ron Word, *Penalty a Waiting Game Out of State's Control*, TAMPA TRIB., July 5, 1996, Florida/Metro Sec., at 6 (discussing Florida's continuing difficulty in securing counsel for death inmates). Currently, at least forty (40), indigent individuals under final sentence of death [32] are without counsel. CCR represents that these individuals are: Anthony Mungin, Robin Archer, Mark Geralds, Aileen Wuornos (I & II),[33] Henry Garcia, Ernest Suggs, Lancelot Armstrong, George Brown, David Pittman, Charlie Thompson, Harry Jones, Noberto Pietri, John Henry (I & II), Ronald Heath, Rodney Lowe, Victor Jones, Thomas Wyatt (II), Kenneth Watson, Gary Whitton, Henry Davis, Michael Lockhart, Kenneth Foster, Jimmie Coney, Victor Farr, Anthony Washington, Brett Bogle, Curtis Windom, Darryl Barwick, James Dailey, Charles Finney, Guy Gamble, James Hunter, Lloyd Allen, Emanuel Johnson (I & II), Michael Coleman, Henry Espinosa, Donald Dillbeck, Ronald Williams, Marvin Johnson, and Thomas Pope. *See Pl.'s Br.* at 23; *Pl.'s Ex. 1*. In addition, CCR states that there are several individuals who were represented by VLRC, and are now without post-conviction counsel. *Id.* at 23–24. Furthermore, there are at least seven (7) unrepresented death prisoners who have accepted Florida's offer of counsel, but can-

not be represented by CCR because of conflict problems with other CCR clients.[34]

Even in the face of this backlog, Defendants contend that Florida has "a mechanism for the appointment, compensation, and payment of reasonable litigation expenses" of post-conviction counsel, and the offer of counsel is made to all capital defendants. Defendants correctly point out that Florida Statutes Chapter 27 outlines appointment, compensation, and conflict representation procedures. Based on this framework, Defendants conclude that "[t]he ... Florida statutes are *prima facia* evidence that the State has complied with the Act, and Plaintiff has failed to sustain his burden of proof to demonstrate otherwise ..." Doc. 14 at 9 (emphasis in original).

The Court rejects Defendants' argument. Chapter 154 of the Act expressly requires "entry of an order by a court of record ... appointing one or more counsels to represent the prisoner *upon a finding that the prisoner is indigent and accepted the offer ...*" 28 U.S.C. § 2261(c)(1) (emphasis added). As a result, once a qualified capital defendant accepts a statutory offer of counsel, that counsel must be appointed immediately. The *Ashmus* court reached the same conclusion, relying in large part upon the language of the report accompanying an earlier version of the Act. *See Ashmus*, 935 F.Supp. at 1057. This report stated: "At a minimum, the immediate benefits to defendants would include the requirement that states electing these procedures actually appoint counsel for the collateral proceedings." 137 CONG.REC. S3220 (daily ed. March 13, 1991). Indeed, to

---

**32.** The definition of "final" employed here is the definition appearing in Section 2263, which triggers the statute of limitations in "opt-in" States. *See* 28 U.S.C. § 2263(a) (180 day statute of limitations begins "after final State court affirmance of the conviction and sentence on direct review of the expiration of the time for seeking such review").

**33.** Several death sentenced individuals have more than one death sentence arising out of separate and distinct cases. The Supreme Court of Florida has treated each of the separate cases as separate clients.

**34.** These individuals include: Michael Coleman, Henry Espinosa, Donald Dillbeck, Ronald

Williams, Bennie Demps, Gerald Stano (I & II), and Marvin Johnson. *See Pl.'s Br.* at 25. CCR indicated that it has not yet hired attorneys for its new conflict unit. In addition, counsel states that CCR is seeking guidance from the Florida Bar on ethical considerations in the creation of such a conflict unit. *Hr'g Tr.* at 13. The parties did not explain why substitute counsel is not being assigned to these individuals in accordance with the new substitution procedures. *See generally* Fla.Stat. § 27.703 (providing for appointment of "one or members of The Florida Bar" to represent collateral defendants when CCR is conflicted out, with such counsel to be paid from funds appropriated to the Justice Administrative Commission).

hold otherwise would render the statutory provisions for compensation and appointment of counsel meaningless.

By comparison, when the Supreme Court of Florida adopted Florida Rule of Criminal Procedure 3.851, which reduced the time for filing post-conviction motions in capital cases from two years to one year, the Justices noted concern over the need for immediate appointment of counsel:

> The [Supreme Court Committee on Post-conviction Relief in Capital Cases] recommended that specific named counsel should be designated to represent each prisoner not later than 30 days after the defendant's judgement and sentence of death becomes final. To assure that representation, the committee's report noted that it was essential that there be adequate funding ...
>
> There is a justification for the reduction of the time period for a capital prisoner ... A capital prisoner will have counsel *immediately available to represent him or her in a postconviction relief proceeding* ...
>
> In the event the capital collateral representative is not fully funded and available to provide proper representation for all death penalty defendants, the reduction in time period would not be justified and would necessarily have to be repealed....

*In re Rule of Criminal Procedure 3.851,* 626 So.2d 198, 199 (Fla.1993) (per curiam) (emphasis added). *See also id.* at 200 (Overton, J., concurring) (one year time period to initiate postconviction proceedings for capital defendant "who has counsel *ready and available* to represent him or her" is reasonable) (emphasis added); *id.* at 201 (Barkett, J., joined by Kogan, J., dissenting) ("The new time limits are conditioned on an understanding that each death-sentenced prisoner *will have a specific lawyer,* whether affiliated with CCR or not, *assigned and available to begin addressing the prisoner's postconviction issues* within thirty days after the judg-

ment and sentence becomes final.") (emphasis added). Clearly, the Justices' concern has even greater force with respect to a statutory provision that would cut in half the filing requirements under Rule 3.851. *See generally id.* at 200 (Overton, J., concurring) (noting that new Rule 3.851 "also gives a defendant twice as long as the six-month period suggested in the Powell Committee Report.").

■ Therefore, the Court holds that any offer of counsel pursuant to Section 2261 must be a *meaningful offer.* That is, counsel must be immediately appointed after a capital defendant accepts the state's offer of post-conviction counsel.[35] The present backlog of unrepresented capital defendants who are in a position to seek post-conviction review, demonstrates that Florida has not made the requisite meaningful offer of counsel.[36] Consequently, Florida cannot qualify as an "opt-in" state for this reason as well.

### c. Summary:

Based upon the foregoing analysis, the Court must preliminary find that Plaintiff has shown a substantial likelihood of success on the merits.

### B. Substantial threat of irreparable injury:

■ "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Wagner v. Taylor,* 836 F.2d 566, 575–76 (D.C.Cir. 1987). In order to establish irreparable injury, a plaintiff must show that his injury is "neither remote nor speculative, but actual and imminent." In addition, "[a]n injury is 'irreparable' only if it cannot be undone through monetary damages." *Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990) (internal citations omit-

---

35. To hold otherwise, as the Defendants apparently suggest, could have the effect of shrinking the six-month statute of limitations under Chapter 154 to such a short amount of time that it would deprive capital defendants of procedural due process.

36. In reaching this preliminary conclusion, the Court is unconcerned with the reasons for the backlog. Regardless of whether it is caused by inadequate funding or a misallocation of resources by CCR, the effect is the same.

ted). If a preliminary injunction is the only way to protect the plaintiff from harm by the defendant, then the plaintiff has satisfied the irreparable injury requirement for injunctive relief. *See, e.g., Cunningham v. Adams,* 808 F.2d 815, 821 (11th Cir.1987).

As shown in greater detail in section II(A)(2), *supra,* Plaintiff faces actual and imminent injury. Plaintiff's injuries, which include possible procedural bars in his habeas proceedings, cannot be undone through monetary damages. Consequently, Plaintiff has demonstrated the requisite irreparable harm.

## C. Weighing injuries to Plaintiff and Defendants:

In light of Plaintiff's likelihood of success on the merits, Plaintiff stands to suffer far greater harm than the Defendants. In the absence of preliminary relief, Plaintiff will be unable to determine the best course of action to protect his statutory and constitutional rights. Preliminary relief will also ensure that the status quo is maintained pending an orderly and expedited resolution of the merits of the Plaintiff's request for declaratory and injunctive relief.

Conversely, preliminary relief will not cause undue hardship to the Defendants. The Defendants undoubtedly have a strong interest in a just and speedy resolution of all federal habeas proceedings. However, it appears likely that Chapter 154 of the Act does not apply to post-conviction proceedings in the State of Florida. Consequently, if the Court requires Plaintiff to submit to the procedural requirements of Chapter 154, and those requirements are later found to be inapplicable, Plaintiff would presumably be in a position to demand that his federal habeas clock begin running anew—in accordance with the appropriate governing procedures. Therefore, granting the preliminary injunction actually tends to further, rather than detract from, Florida's interest in securing the earliest possible finality in its capital decisions.

## D. Whether injunction would disserve the public interest:

■ "The most compelling reason in favor of [granting a preliminary injunction] is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2947, at 123. *See also Productos Carnic, S.A. v. Central Am. Beef & Seafood Trading Co.,* 621 F.2d 683, 686 (5th Cir. 1980)[37] (affirming district court's decision that preliminary injunction was necessary to prevent defendants' conduct from frustrating judgment on the merits of the underlying controversy). As discussed in the balancing of the parties' interests, *supra,* Defendants' improper application of Chapter 154 of the Act to Plaintiff's habeas petition, could very well nullify any result obtained in those proceedings. The public's interest therefore militates in favor of granting the requested preliminary injunctive relief.

## III. CONCLUSION

Defendants have argued that it is not this Court's province to oversee Florida's capital collateral agency. *Hr'g Tr.* at 19. The Court agrees. However, Plaintiff is not asking the Court to do that. Instead, Plaintiff seeks a judicial determination of whether the type of counsel the State of Florida provides to indigent capital defendants prisoners in post-conviction proceedings, as well as statutes and rules of court governing appointment and qualifications of such counsel, allows Florida to take advantage of the procedural benefits of Chapter 154. The Court may make such a determination without dictating matters of policy and finance to the Florida Legislature.

In preliminarily finding that Florida does not qualify as an "opt-in" state, the Court is not unsympathetic to the position of the State Defendants. The Act was passed in large part to curb abusive and repeated use of a habeas petition process that has rendered the death penalty a virtual nullity not only in Florida, but throughout the United

---

**37.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

States.[38] The judicial system has permitted many prisoners to sit on death row for years or even decades after their capital convictions and direct appeals of those convictions have become final. In fact, Plaintiff himself is a paradigm example of the system's many flaws. Thirteen years after his conviction and sentence, Mr. Hill is still litigating his appeals in federal court. Clearly, the State of Florida and its residents have a substantial interest in obtaining some degree of finality in decrees of death for prisoners such as the Plaintiff.[39]

Nevertheless, as the discussion above has demonstrated, the State of Florida does not appear to be in a position to take advantage of the many benefits conferred by Chapter 154 of the Act. This ruling, at such an early stage of these proceedings, is premised on the preliminary findings that Florida has failed to ensure the competency of post-conviction counsel, and has not provided a meaningful offer of counsel to capital defendants. As a result, it appears that the State of Florida has failed to fully comply with the requirements for post-conviction review set forth in 28 U.S.C. § 2261.

In finding that Plaintiff is entitled to preliminary relief, the Court is mindful that Defendants will likely want immediate review of this ruling by the Eleventh Circuit. *See generally* 28 U.S.C. § 1292(a)(1) (a district court's order granting an injunction is an interlocutory decision that may be appealed to the court of appeals). If Defendants intend to seek such review, the Court will entertain any motions to stay imposition of the preliminary injunctive decree, so long as they are filed within 10 (ten) days of this order.

However, in so holding, the Court is also keenly aware that far too often such interim appellate review has been used to further protract the underlying habeas proceedings. The Court does not intend to allow the instant case to serve as a vehicle for delaying resolution of the requests for habeas relief by Plaintiff, or any other indigent capital defendant. In addition, the Court notes that the ultimate determination of whether Florida may take advantage of the procedural benefits conferred under Chapter 154 of the Act does not require a complex factual or legal inquiry. Consequently, discovery will proceed on an expedited basis during the pendency of any appeal, and a date certain shall be set for a final hearing on the merits of Plaintiff's claim.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. Plaintiff's motion to exceed page limitation (Doc. 8) is GRANTED.

2. Plaintiff's motion for emergency hearing and relief (Doc. 10) is GRANTED NUNC PRO TUNC.

3. Plaintiff's motion for a preliminary injunction or alternative relief (Doc. 6) is GRANTED IN PART. The motion is granted to the extent it seeks preliminary injunctive relief as to Plaintiff Clarence Edward Hill, and denied at this time as to any other member of the putative plaintiff class.

4. Defendants are preliminary enjoined from asserting against Plaintiff, in any state

---

**38.** In 1995, fifty-six murderers were put to death in the United States—the largest number in nearly four decades. However, in Florida, where convicted murderers spend an average of 9.7 years on death row, there were only three executions. Diane Hirth, *State Looks to Shrink Death Row Appeal Time—Executions Expected to Increase in 1996*, Ft. Lauderdale Sun-Sentinel, Dec. 30, 1995, at A1. In fact, in the twenty-two years since Florida reinstated the death penalty, more than seven hundred convicted murderers have been sentenced to death, but fewer than forty have actually been executed. Bentley Orrick, *Murderers Detour from Death Row: Legal Appeals Help Keep Most Condemned Killers in Florida from Being Executed in the Electric Chair*, Tampa Trib., Nov. 6, 1995, Florida/Metro Sec., at 1.

**39.** The Court concurs with the Supreme Court of Florida's discussion of this point:

> The importance of finality in any justice system, including the criminal justice system, cannot be understated. It has long been recognized that, for several reasons, litigation must, at some point, come to an end. In terms of the availability of judicial resources, cases must eventually become final to allow effective appellate review of other cases.... [A]n absence of finality casts a cloud of tentativeness over the criminal justice system, benefiting neither the person convicted nor society as a whole. *Witt v. State*, 387 So.2d 922, 925 (Fla.), *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980).

or federal proceeding, that Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, Title I, § 101 *et seq.,* 110 Stat. 1214 (1996) (codified as 28 U.S.C. §§ 2261–66), applies to Plaintiff.

5. The preliminary injunction shall remain in full force and effect until further order of the Court.

6. Since Defendants have failed to demonstrate a risk of monetary loss from the issuance of a preliminary injunction, no bond will be required under Rule 65 of the Federal Rules of Civil Procedure.[40]

7. Any motions to temporarily stay the preliminary injunctive relief granted herein shall be filed within ten (10) days of this order.

8. The clerk of the court will send out a scheduling order setting a forty-five (45) day period for discovery to be conducted.

9. A final hearing on Plaintiff's request for permanent injunctive relief is **SCHEDULED** in this matter on Thursday, October 10, 1996, at 9 a.m. at the United States Courthouse, Tallahassee, Florida. No pretrial conference shall be held.

### *Attachment A*

### *Shevin Report*

February 26, 1996

The Honorable Stephen H. Grimes

Chief Justice

Supreme Court of Florida

500 South Duval Street

Tallahassee, Florida 32399–1925

Re: Study Of The Capital Collateral Representative

Dear Mr. Chief Justice:

I am pleased to submit the following report based on my study of the Office of the Collateral Capital Representative ("CCR") and the current status of postconviction counsel for Florida's death row inmates.

### BRIEF PROCEDURAL HISTORY

In June of 1995, Michael J. Minerva, the head of CCR, filed a motion for relief from the new one-year deadline for filing 3.850 postconviction motions in capital cases. See Fla.R.Crim.P. 3.851. At the same time, Mr. Minerva stopped designating individual staff counsel to represent death row inmates whose one-year deadline had started running. At present, there are 40 inmates for whom CCR is the statutorily authorized representative, but for whom CCR has refused to designate individual counsel.

Mr. Minerva's actions were precipitated by the Supreme Court's affirmance in 1994 of 46 new death penalty cases, twice the historical average. Mr. Minerva's motion claimed that CCR could not incorporate all of these cases into its current caseload of 138 clients, and that to accept all of these cases with a one-year filing deadline would require his staff attorneys to violate their ethical duty of providing effective assistance of counsel.

Mr. Minerva supplemented his motion for relief in August of 1995 after the Volunteer Lawyers' Post–Conviction Defender Organization, formerly known as the Volunteer Lawyers' Resource Center ("VLRC"), announced that it was losing its federal funding and that the representation of some or all of its 41 clients might be passed to CCR.

The Attorney General opposed CCR's motion to extend the one-year filing deadline, claiming that it was not based on empirical data regarding attorney workload, and that lawyers in the Attorney General's office handled more cases with fewer lawyers.

The Florida Supreme Court denied CCR's motion. CCR then moved for reconsideration and clarification. To assist the Court in assessing whether CCR can reasonably be required to take any additional cases, and if so, how many, the Court requested that I study the situation and the claims of the interested parties, and that I prepare a report in the nature of a Special Master's Report. I asked Richard Simring to assist in this project. Mr. Simring is an associate in my law firm who clerked for former Chief Justice Rosemary Barkett. He is familiar

---

**40.** *See City of Atlanta v. Metropolitan Atlanta* *Rapid Transit,* 636 F.2d 1084 (5th Cir.1981).

with Florida's death penalty jurisprudence, CCR's work product, and the procedural intricacies of postconviction legal representation in death penalty cases.

## SOURCES CONSULTED

As part of my study I consulted at some length with the following individuals:

A. The Office of CCR
 1. Michael J. Minerva, Head of CCR
 2. Martin McClain, Chief Assistant CCR
 3. Daren Shippy, Staff Attorney
 4. Sharon Sinclair, Administrative Services Director
 5. Jeffrey Walsh, Chief Investigator

B. The Attorney General's Office
 1. Robert A. Butterworth, Attorney General
 2. Peter Antonacci, Deputy Attorney General
 3. Carolyn Snurkowski, Director of Criminal Appeals
 4. Richard Martell, Chief of Capital Appeals

C. The Florida Supreme Court
 1. Chief Justice Stephen H. Grimes
 2. Justice Charles T. Wells
 3. Justice Ben F. Overton
 4. Tanya Carroll, Assistant Clerk for Capital Cases

D. The Office of the Governor
 1. W. Dexter Douglass, Counsel to the Governor
 2. Phyllis Hampton, Assistant Counsel

E. Representative Elvin L. Martinez, Chair of the House Criminal Justice Committee.

F. Chandler R. Muller, President of the Board of VLRC.

G. Judge Rodolfo Sorondo, Jr., Criminal Division, 11th Judicial Circuit in and for Dade County, Florida.

H. Judge Thomas M. Carney, Criminal Division, 11th Judicial Circuit in and for Dade County, Florida.

I. Bennett H. Brummer, Public Defender, 11th Judicial Circuit in and for Dade County, Florida.

J. James Rinaman, Former President of The Florida Bar.

K. Michael Millman, Executive Director of the California Appellate Project.

I also reviewed numerous written materials, including the 1987 Caseload/Workload Formula developed for CCR by The Spangenberg Group (the "Spangenberg Report"), the report of the federal Subcommittee on Death Penalty Representation chaired by Judge Emmett Ripley Cox of the Eleventh Circuit Court of Appeals (the "Cox Report"), the American Bar Association Standards for representation in death penalty cases (the "ABA Standards"), the Report of the Supreme Court Committee on Postconviction Relief in Capital Cases chaired by Justice Ben F. Overton (the "Overton Committee Report"), the Florida Supreme Court's case tracking summary of active death penalty cases, CCR's current caseload docket, CCR's 1996–97 legislative budget requests, and the Governor's 1996–97 budget recommendations.

## TWO QUESTIONS PRESENTED

I have been asked to address two principal questions:

First, is CCR capable of accepting the 40 new cases in which they have so far refused to designate counsel?

Second, how should the State of Florida provide support to private counsel in the 41 cases that were previously assisted by VLRC?

## I. OVERVIEW

### A. THE THREE STAGES OF DEATH PENALTY PROCEEDINGS

Every death-sentenced defendant may challenge his or her conviction and sentence in three separate proceedings. The first two proceedings are governed by state law.

On *direct appeal*, the defendant contends that the trial judge committed errors of law that require reversal of the conviction or the sentence. CCR does *not* represent defen-

dants in direct appeals. Rather, direct appeals are handled either by the appellate division of the public defender's office, or by private counsel. Pursuant to article V, section 3(b)(1) of the Florida Constitution, the Florida Supreme Court has mandatory jurisdiction over direct appeals in capital cases. Review of the Florida Supreme Court's decision is to the United States Supreme Court by petition for certiorari.

*State postconviction (or collateral) review* follows direct appeal. On collateral review, defendants raise *errors that were not and could not be raised on direct appeal.* Rule 3.850, which is the procedural mechanism to file collateral proceedings, requires that motions be filed in the original trial court, with direct review to the Florida Supreme Court.

3.850 motions are usually limited to three categories of claims: (i) ineffective assistance of trial counsel; (ii) violations of *Brady v. Maryland,* 373 U.S. 83 (1963), which holds that the suppression of material, exculpatory evidence by the prosecution violates due process; and (iii) newly discovered evidence, such as post-trial recantation by a principal witness.[1]

In 1994, the Florida Supreme Court enacted Rule 3.851, based in part on the recommendations in the Overton Committee Report. Rule 3.851 requires that postconviction motions in death penalty cases be filed within 1 year from the date that the United States Supreme Court denies certiorari in the defendant's direct appeal. (The former rule allowed 2 years to file postconviction motions in all cases, including death penalty cases.)

*Federal habeas corpus* is a statutory remedy provided for by 28 U.S.C. § 2254(a) that permits a state inmate to ask the federal district court to review any violation of federal law that may have tainted the inmate's conviction or sentence. Subject to limited exceptions, the federal court may only consider claims previously asserted in the direct appeal or the 3.850 review; thus, federal habeas petitions are the last stage of death penalty proceedings. Review of the federal district court's habeas decision is to the Eleventh Circuit Court of Appeals, and then to the United States Supreme Court.

Under the current practice in Florida, the Governor will not sign a death warrant until a death-sentenced defendant has exhausted his or her 3.850 remedy and federal habeas corpus review. Once the Governor signs a death warrant, however, an inmate typically files a *second* 3.850 motion, a *second* federal habeas petition, and various motions to stay the execution pending resolution of this second round of proceedings.

## B. *WHAT IS CCR?*

CCR was created by the Florida Legislature in 1985 for the following purpose:

> [T]o provide for the representation of any person convicted and sentenced to death in this state who is unable to secure counsel due to indigency, so that collateral legal proceedings to challenge such conviction and sentence may be commenced in a timely manner and so as to assure the people of this state that the judgments of its courts may be regarded with the finality to which they are entitled in the interests of justice.

§ 27.7001, Fla.Stat.

CCR is obligated to represent *all* indigent death-sentenced defendants in collateral proceedings in both state and federal courts, including the United States Court of Appeals for the 11th Circuit and the United States Supreme Court. § 27.702(1), Fla.Stat. The only defendants that CCR cannot represent are defendants in cases where CCR may have a conflict of interest, such as where two defendants have been convicted as co-defendants, or where CCR staff counsel participated in the direct appeal. § 27.703, Fla.Stat.

The head of CCR is appointed by the Governor, subject to Senate confirmation, for a 4-year term. § 27.701, Fla.Stat. CCR is authorized to employ full-time staff attorneys, investigators, and necessary support personnel. § 27.704(1), Fla.Stat. Staff at-

---

1. Defendants may also file a state habeas corpus petition to challenge the adequacy of their appellate counsel on direct appeal. This petition is filed simultaneously with the initial brief in the appeal of the circuit court's order on the 3.850 motion. Fla.R.Crim.P. 3.851(b)(2).

torneys are required to be members in good standing of the Florida Bar with not less than two years experience in the practice of criminal law. *Id.* The principal office of CCR is in Tallahassee, although CCR is statutorily authorized to establish branch offices. *Id.*

When providing representation in federal courts, CCR is required to supplement its budget by filing motions for compensation as permitted under federal law, such as under the federal Anti–Drug Abuse Amendments Act of 1988, 21 U.S.C. § 848(q), and to deposit all payments received into the Capital Collateral Trust Fund. § 27.702(2), Fla.Stat.

### C. WHAT IS VLRC?

VLRC was formed in 1988 to train and assist volunteer *pro bono* lawyers and law firms who undertook to represent death-sentenced defendants in collateral proceedings. Over the years, it has become apparent that VLRC has been providing *substantial* assistance to volunteer counsel of record—above and beyond training and advice—including extensive investigation into clients' life histories, drafting pleadings, and appearing as co-counsel at hearings.[2] Recently, VLRC staff counsel has been directly representing capital defendants, primarily in federal habeas proceedings, where CCR has a conflict of interest or where volunteer counsel could not be found.

As of January 1, 1996, VLRC had 20 full-time employees, including 8 staff attorneys, four investigators, and attendant support staff. VLRC's annual budget for 1995–96 was approximately $1.5 million in federal funds.

On March 1, 1996, federal funding for Florida's VLRC, as well as the 20 other postconviction defender organizations across the country, will cease. The closing of VLRC has created another variable that needs to be addressed with respect to the representation of Florida's death row inmates.

VLRC currently provides representation, with the assistance of volunteer lawyers, to 41 death row inmates, 19 of which are "conflict cases" that cannot be represented by CCR. The reason that VLRC represents 22 defendants who, by statute, should be represented by CCR, is that CCR became overloaded with cases during Governor Martinez's administration (due to the record number of death warrants). In addition, the Overton Committee Report recommended that VLRC provide temporary relief to CCR pending CCR's receipt of adequate funding.

There is presently no logical reason to maintain the distinction between CCR and VLRC with respect to these 22 non-conflict cases. The problem, of course, is that the 40 cases that created the current impasse could become a 62-case problem, which would represent an approximate 45% increase in CCR's client base if all the allowable cases were assigned to CCR.

### D. THE 1991 OVERTON COMMITTEE REPORT

In early 1991, the Florida Supreme Court convened the Committee on Postconviction Relief in Capital Cases to address CCR's inability to process its current caseload and because of substantial delays in the resolution of capital collateral proceedings.

The Committee made a number of significant findings in its 1991 report. First, that CCR was underfunded and understaffed despite its 1990–91 budget of $1.9 million. Second, that one of the major problems with the collateral process was that the triggering mechanism to start the postconviction relief process moving was the signing of a death warrant, resulting in a disorderly and unmanageable system of representation. Third, that all the parties involved in the death penalty process—CCR, the Attorney General, the Governor, and the Courts—needed to coordinate their efforts to monitor

---

**2.** The Cox Report (pp. 9–10) found that postconviction defender organizations across the county were also providing substantial assistance to volunteer counsel, leading the report to conclude that VLRC–type assistance organizations should convert to CCR–type direct representation organizations, to "both improve the quality of representation and reduce the cost per case."

.death penalty cases and to assure that there are no unjustified delays.

Consistent with these findings, the Committee made three recommendations. The first recommendation, which resulted in the enactment of Rule 3.851, was that CCR should designate specific named counsel no later than 30 days after certiorari was denied in a capital inmate's direct appeal. Second, the Committee recommended that the initial round of collateral proceedings should be completed within a period of 2 years and eight months. To accomplish this time table, the Committee recommended that Rule 3.850 be shortened to 1 year in capital cases, and that trial court should resolve 3.850 motions on an expedited basis. Third, the Committee recommended that, to avoid delays at the trial court level, the clerk of the circuit court in each county should designate one person to be responsible for monitoring the progress of each case, and that the Clerk of the Supreme Court also assign one person to track the cases on a statewide basis.

The Overton Committee Report eventually resulted in a number of significant changes to the current system, including the passage of Rule 3.851. Unfortunately, the Committee's recommendations were not fully realized. Most important, although there was a clear recognition that CCR lacked sufficient funds and staff, the Legislature did not sufficiently increase CCR's funding.[3] In addition, trial judges for the most part do not appear to have expedited the processing of 3.850 motions, and Circuit Court clerks have not designated individuals to monitor death penalty postconviction cases on the local level.

## II. ANALYSIS

### A. CCR'S HISTORICAL CASELOAD AND BUDGET

In 1985, when CCR was created, it was assumed that CCR would handle approximately 15 cases per year. Overton Committee Report, page 2. Although CCR's proponents requested a $2 million initial budget, CCR's 1985–86 budget was established at $840,000.[4] By July 1, 1991, CCR had 83 clients and an annual budget of $1.9 million.

CCR's budget substantially changed in 1994 with the adoption of Rule 3.851. In that year, CCR received an extra $1 million in funding ($750,000 from the Legislature and $250,000 from the Florida Bar Foundation) to compensate it for the 1-year reduction in filing time. The rule change was premised on the assumption that a capital defendant would have individual counsel *assigned and available to begin addressing the prisoner's postconviction issues within 30 days after the judgment and sentence become final.* Rule 3.851(b)(3) (emphasis added). As indicated in the Commentary to the rule, which is based on the Overton Committee Report, the reduction in the time period was conditioned on CCR being "fully funded."

By July 1993, CCR's caseload increased 20%, to 100 clients, and by July 1994 to 118 clients. As of June 1995, CCR's assigned case load had grown to 141 clients, representing a 59% increase in clients since 1991, with no increase in budget to directly correspond to the increase in clients.

The current impasse arose after the Court affirmed 46 death penalty cases in 1994.[5] As a result of these affirmances, CCR would have been required to file 3.850 motions in most of the 46 cases in 1996. This would

---

3. The $1 million increase that occurred in 1993–94 was designed to compensate CCR for the increased workload resulting from the one-year reduction for filing of 3.850 motions.

4. Adequately funding and staffing CCR has never been an exact science. Larry Helm Spalding, the first head of CCR, testified before the 1987 Senate Appropriations Subcommittee that CCR's budget was only "a best guess" because there was "nothing comparable to [CCR] any place in the country."

5. The extremely high number of affirmances in 1994 was caused by the departure of two Supreme Court Justices, Rosemary Barkett and Parker Lee McDonald. Justice Barkett was appointed to the United States Court of Appeals for the Eleventh Circuit, and Parker Lee McDonald retired. The Court issued final decisions in all cases in which Justices Barkett and McDonald were sitting in order to avoid giving a back log of cases to the two new Justices, Harry Lee Anstead and Charles Wells.

represent approximately twice the number of 3.850 motions that CCR regularly files in any given year. Pursuant to a previous order of extension, CCR was supposed to begin designating lawyers for 40 of these cases in May of 1995. The current impasse was created when CCR began refusing to designate lawyers in any of the 40 cases.[6]

### B. CURRENT POSTCONVICTION CAPITAL COUNSEL STATISTICS

Florida currently has 367 death row inmates. 139 of the inmates are now involved in the direct appeal of their cases. All of these defendants are represented either by private counsel or local public defender organizations.

There are 228 postconviction cases in various stages of collateral proceedings. These defendants are represented as follows:

| | |
|---|---|
| CCR: | .138 |
| VLRC: | 41 |
| Undesignated CCR Cases: | 40 |
| Privately Retained Counsel: | 4 |
| Unrepresented Conflict Cases: | 5 |
| TOTAL: | 228 |

### C. A PROPOSED SOLUTION

CCR has 20 full-time staff attorneys. It is authorized to hire 22 attorneys, and plans to fill the two empty positions shortly. Of the 20 lawyers, only 11 function as "lead counsel." The remaining attorneys sit as "second chair" counsel to assist the lead counsel in drafting motions and arguing evidentiary hearings.[7]

CCR's 138 cases are assigned as follows:

**6.** The deadlines to designate counsel have already passed for 25 of the 40 cases; the deadlines in the other 15 cases are approaching.

**7.** Unfortunately, I have been advised that these 2 new attorneys do not have the requisite 2 years criminal experience required by section 27.704(1).
Most authorities, including the American Bar Association Guideline 2.1, recommend that 2 lawyers be assigned to work on each capital case. There is no reason to question this authority.

| | |
|---|---|
| Anderson, Gail | 16 |
| Anderson, Mary | 4 |
| Backhus, Terri | 20 |
| Brewer, Heidi | 2 |
| Gardner, Lissa | 4 |
| Kissinger, Stephen | 29 |
| McClain, Martin | 21 |
| Scher, Todd | 14 |
| Schavazz, Harum | 8 |
| Shippy, Daren | 12 |
| Strand, Bret | 8 |
| TOTAL: | 138 |

The 138 cases are in the following procedural postures: 3.850 motions have been filed in all but 7 cases; 90 cases are pending at the circuit court level, having had no evidentiary hearing; 19 are on appeal to the Florida Supreme Court; 18 cases are pending habeas corpus review in the federal court; 5 cases have completed the first round of collateral appeals.

Based on its historical record of filing sixteen or seventeen 3.850 motions annually, but also recognizing that CCR filed 28 3.850 motions in 1995; CCR should be able to absorb a good portion of the 40 impasse cases into its caseload.

CCR contends that it has "just about" reached its limit, and that, even if extensions of time are granted, it cannot accept many more cases. The basis for CCR's contention is its claim that the volume of 138 cases has a cumulative weight that cannot be measured with complete objectivity. Although there is some basis for this claim—especially because 90 cases have not yet been decided by the trial courts, some of which have been pending for up to 4 years—the claim must be countered by the fact that CCR has filed 3.850 motions in virtually all of its cases. Because the bulk of CCR's investigation should be performed before 3.850 motions

Having two lawyers assigned to a case safeguards against mistakes, assures that, if one lawyer resigns, there will be another lawyer familiar with the case, and helps to avoid scheduling conflicts. However, with contemporaneous time records, it would be easier to evaluate the work done by second-chair lawyers to determine their value to particular cases. It may be, as suggested by the Attorney General's office, that some second-chair lawyers are performing work that could be done by investigators or paralegals.

are filed, it would appear that CCR can accept new cases.

The problem would be more easily resolved if there was an accepted methodology to determine the maximum annual caseload for capital lawyers. The existing studies, including the Cox Report and the Spangenberg Report, indicate that each lawyer should be assigned no more than 4–6 cases per year. There is cause, however, to doubt the accuracy of this figure. First, both studies are based on anecdotal, not empirical data, without the benefit of contemporaneous time records. Second, the studies do not attempt to account for variables among individual cases in terms of their complexity. Third, the studies do not adjust for the substantial learning curve in capital cases—a factor that weighs in favor of institutional specialists such as CCR staff counsel. Finally, the studies are inconsistent with the proven fact that CCR lead attorneys have been able to handle twice the recommended number of cases (an average of 12) on an annual basis.

I believe that CCR is required by statute to accept the 40 impasse cases, and that CCR can, in fact, incorporate these cases into its current workload on an incremental 3.850 schedule. CCR's ability to accept *all* of these cases will depend, in part, on the implementation of certain reforms. These reforms, as discussed below, are (i) approval of at least the Governor's budget recommendation to fund six additional staff attorneys and six additional investigators; (ii) reform of the Chapter 119 process in 3.850 proceedings; (iii) the formation of CCR branch offices; and (iv) refinement by CCR of its advocacy methods.

My recommendation is as follows: CCR should designate counsel from its existing staff of attorneys to incorporate at least 20 of the 40 impasse cases. This staffing can be accomplished by promoting at least 2 second-chair attorneys to lead attorney positions and by assigning more cases to existing lead attorneys with lighter caseloads. This will account, at worst, for dividing 20 new cases among 13 lead attorneys.[9]

I would recommend that CCR be required to designate counsel in the 20 oldest cases over a several month period, with at least 4 cases being designated each month. That would allow for an orderly transition (a minimum of one case per week), and it would also allow time for the implementation of some of the reforms recommended below.[10]

My proposal assumes that, in every case, CCR should be given the full 11 months anticipated by Rule 3.851 to investigate and file the 3.850 motion. In addition, as mentioned above, my proposal assumes that the reforms outlined below will be implemented, thereby easing some of the burden on CCR. Finally, this schedule recognizes that CCR has already gained an approximate 10–month respite by virtue of the present impasse.

As to the second set of 20 cases, I believe that they should be incorporated as part of the 6 new lawyers that CCR will hopefully be authorized to hire by the Legislature, consistent with the Governor's recommended budget. Each of these lawyers should be qualified to handle 4 new cases, and also should be able to assist as second-chairs on existing cases.[11] I would recommend that CCR be required to designate counsel in these cases over a several month period beginning in September or October 1996.

9. CCR indicated that at least two of its second-chair lawyers are ready for promotion. They can each take two or three new cases as lead counsel. In addition, it appears that Heidi Brewer, Lissa Gardner and Mary Anderson should be able to accept from 2 to 4 new cases each. That would allow for an equitable distribution of the remaining 2 to 10 cases to *some* of the lead counsel with larger caseloads.

10. Rule 3.851(b)(4) allows for the extension of time for the filing of postconviction pleadings upon a showing of good cause. I believe that the facts and circumstances set forth in this Report constitute "good cause."

11. I am assuming that, with the creation of branch offices, and the provision of additional funding, CCR will be able to hire experienced mid-level attorneys to fill these six positions and will *not* continue to hire only entry level lawyers.

## D. *RECOMMENDED REFORMS TO THE 3.850 PROCESS*

In making my recommendation, I respectfully, but strongly suggest that reforms be implemented in the following four areas.

### 1. *Approval Of The Governor's 1996–97 Recommended Budget For CCR*

The most important financial reform for resolving the present impasse is for the Legislature to adopt the Governor's recommended budget for CCR as part of the 1996–97 Budget. Although CCR has requested that the Legislature double its budget and staff size, I believe that the Governor's budget recommendation is more realistic and will be initially sufficient to accomplish most of the recommendations set forth in this Report.

The Governor has recommended an annualized increase in CCR's budget of approximately $730,000, with 14 new positions as follows:

(i) 6 new staff attorneys;

(ii) 6 new investigators;

(iii) 2 new secretaries.

I believe that this request would provide funds that are both reasonable and necessary to resolve the current impasse, and that it should be funded by the Legislature. In addition to these funds, the Legislature should appropriate *additional* funds for increased salary levels to allow CCR to hire more experienced mid-level attorneys.[12]

### 2. *The Chapter 119 Problem*

Rule 3.851 requires that 3.850 motions be filed within 1 year after the judgment and sentence become final. CCR has 30 days at the outset to designate counsel, leaving 11 months to investigate and file each 3.850 motion.

One of the major problems confronting CCR attorneys is the absence of any formal discovery attendant to 3.850 motions. Discovery of certain documents, such as the prosecutor's files and the local police files, are obviously necessary for CCR to prepare a 3.850 motion. Without these records, CCR cannot determine whether a defendant has a legitimate claim for ineffectiveness of trial counsel, the withholding of exculpatory material, or newly discovered evidence.

Because there is no formal 3.850 discovery mechanism, CCR is required to seek documents through Chapter 119 public records requests. Because the trial court that will ultimately determine the 3.850 motion has no involvement with administering the Chapter 119 requests, it cannot assist in resolving disputes between CCR and state and local agencies. As a result, CCR has been required to file separate civil lawsuits to resolve Chapter 119 disputes, resulting in significant delays and time consuming civil litigation.[13] CCR estimates that it has over 100 pending Chapter 119 civil suits.[14]

The Supreme Court should promptly solve this problem by enacting a Rule of Discovery in 3.850 proceedings, *with expedited time schedules* for both the requesting and providing of public records, for the filing of objections, and for the resolution of disputes by the trial judge who eventually will rule on the 3.850 motion. The goal of the new rule should be to expedite CCR's access to Chapter 119 information so that it can be reviewed by CCR in time to be incorporated in the original 3.850 motion. The new rule should eliminate a significant portion of the delay in ruling on 3.850 motions that has occurred

---

**12.** Beginning staff attorneys earn approximately $32,000 annually, while mid-level attorneys receive approximately $43,000 annually. There is a clear benefit to increasing the overall funding for salaries and thereby allowing CCR to hire more experienced attorneys who can immediately become first chair lawyers.

**13.** As it stands, CCR has been required to file incomplete 3.850 motions to meet the one-year deadline, reserving the right to supplement the motion upon the receipt and review of belated Chapter 119 materials. This procedure obviously defeats the purpose of Rule 3.851.

**14.** Part of the problem in obtaining Chapter 119 material has been the result of lack of cooperation in providing prompt and full disclosure by some state and local agencies. Although the Attorney General has indicated that such files should be disclosed as a matter of public policy, he does not have the authority to mandate disclosure.

because of tangential civil litigation and the inability of CCR to file a *complete* 3.850 motion within the 1 year time period.

### 3. The Need For Branch Offices.

CCR is a statewide public defender organization. It is required to represent all indigent death-sentenced defendants regardless of the county in which they were convicted. Thus, although all of CCR's clients are housed on death row at Union Correctional Institution in Raiford, CCR is required to file 3.850 motions in the trial courts of the counties where the defendants were originally convicted. ·Because CCR's only office is in Tallahassee, CCR investigators and lawyers have been required to travel throughout the State of Florida to handle hearings and to investigate cases.

CCR currently spends over $100,000 per year in travel expenses for its attorneys and investigators. In addition, CCR loses countless hours of attorney and investigator time in transit, and in setting up temporary field offices when arguing evidentiary hearings in other parts of Florida.

An analysis of CCR's current caseload indicates that over one-half of its cases (70 of the 138 existing cases and 21 of the 40 impasse cases) are pending in the middle of the state across the I–4 corridor. The remaining cases are almost evenly divided between North and South Florida.

Although CCR is required by statute to have a Tallahassee office, it is also authorized to establish branch offices. § 27.701, Fla. Stat. I strongly recommend that CCR take advantage of this authority, and that the Legislature provide the necessary "start up" capital for CCR to lease office space and to purchase necessary office equipment. Two branch offices should be opened. The first should be in the I–4 corridor (which· corresponds to the federal Middle District), and the second should be in South Florida. Establishing branch ·offices will conserve valuable time and resources, and should facilitate the movement of CCR's cases through the court system. It will also have the additional benefit of helping CCR to recruit qualified mid-level lawyers.

### 4. Complaints About CCR's Litigation Tactics

One of the major concerns expressed by both judges and lawyers was that CCR often raises issues that were previously resolved against collateral capital defendants by the Supreme Court. More disturbing, based on a review of a recent 3.850 motion, these issues were raised by CCR without disclosure of the prior adverse precedent, or by relying on inapplicable case law.

For instance, in this recent 3.850 motion, CCR raised, among other things, the meritless argument that death by electrocution of capital defendants is unconstitutional because it violates the cruel and unusual punishment clause of the United States Constitution. This argument has clearly been decided adversely to CCR's clients, *Gregg v. Georgia*, 428 U.S. 153 (1976), but CCR does not cite the adverse authority. CCR further argued that Florida's capital sentencing scheme fails to prevent the arbitrary imposition of the death penalty, citing a recent United States Supreme Court decision, *Richmond v. Lewis*, 113 S.Ct. 528 (1992), that is inapposite.

In short, CCR's 3.850 motions, as well as its appellate briefs, argue every issue, including the proverbial "kitchen sink," even though some issues may be meritless. This tactic lessens confidence in the Bar and in the judiciary as a whole, and undermines the goal of expeditiously resolving these cases.

CCR lawyers believe that they must raise all legal issues, even if they have been decided adversely against their client, in order to preserve them for future review. ˙ This can be done, however, without the presentation of extensive legal argument resulting in 170–page motions that create unnecessary delays at the trial level. Issues that have been adversely decided can simply be listed at the end of the 3.850 motion, with the express notation that they are being raised only to preserve the issue for appellate review.[15]

---

**15.** ˙ Rule 4–3.3(a)(3) of the Florida Rules of Professional Conduct, provides that a lawyer shall *not* knowingly "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by oppos-

### E. *OTHER SIGNIFICANT ISSUES*

In addition to the issues discussed above, I believe it is necessary to note a number of other significant issues that recurred throughout my study and that have influenced my report.

### 1. *"Death Is Different"*

When I argued *Proffitt v. Florida,* 428 U.S. 242 (1976), for the state, I agreed with the United States Supreme Court Justices that the death penalty was, in fact, "different" from other criminal sanctions because of the immutable consequence of the punishment. That is why, in upholding the constitutionality of Florida's death penalty, the Court recognized the necessity for heightened procedural and substantive protections for capital defendants. These necessary protections have resulted in extra time and expense associated with death penalty representations.

### 2. *Expertise And Continuity Of Counsel*

Florida and federal death penalty jurisprudence is complex and rapidly evolving. This fact was recognized by all of the sources I consulted. The complexity of death penalty jurisprudence is evidenced by the delay in trial court rulings on 3.850 motions, and the difficulty in retaining volunteer counsel.

In addition to having the requisite expertise, when the same attorney represents an inmate in both the state and federal postconviction proceedings, and through the signing and carrying out of a death warrant, both time and money are saved. Continuity of counsel assures that all of the investigation and legal research that go into the preparation of the 3.850 motion do not have to be "reinvented" at each stage of postconviction review.

### 3. *The Problem With Total Privatization As A Long–Term Solution*

The Cox Report (page 6) contains the following significant finding: "Private lawyers who communicated with the Subcommittee almost uniformly expressed the view that they would not willingly represent a death-sentenced inmate without the assistance of a [postconviction defender organization] or similar organization."

My consultations with Bennett Brummer, the Public Defender for Dade County, Chan Muller, the president of the Board of VLRC, and James Rinaman, former President of the Florida Bar, confirmed that, historically, the private Bar in Florida has *not* been generally forthcoming in accepting death penalty cases. The recent problem in finding representation for the 5 conflict cases that are not being handled by VLRC further illustrates the reality of this problem.[16] Death penalty cases, while professionally rewarding, are extraordinarily burdensome in terms of the expense, the magnitude of the work, the complexity of the legal issues, and the emotionally exhausting nature of the representation.

Even assuming that a sufficient number of private counsel could be attracted, on a fee basis, to handle *all* of Florida's postconviction death penalty cases (which is *unlikely* ), the cost of privatization would substantially exceed the cost of funding CCR. In California, for instance, the average annual cost per case for private counsel, including the assistance of the California Appellate Project, is approximately $50,000. In Florida, if we average $50,000 annually per case (assuming qualified private lawyers were available), the cost would be approximately $9 million per year to fund just the existing 138 cases and the 40

---

ing counsel." CCR raises issues for their clients, with knowledge of legal authority directly adverse to their clients' positions, and without disclosing this either to the trial judge in the 3.850 motion or to the Florida Supreme Court in the appellate briefs. This procedure evades the spirit of the rule and should *not* be tolerated. It also has the effect of lengthening the entire 3.850 procedure, both at the trial and appellate levels, and is probably one of the reasons that 90 cases remain pending at the trial court level.

16. Michael Millman, the Executive Director of the California Appellate Project, indicated that California was considering changing from a VLRC–type program to a CCR–type program because of the inability to find volunteer counsel for 125 unrepresented capital defendants in California.

impasse cases. In addition, as Mr. Rinaman suggested, significant resources would be expended in the recruiting process itself.

The institutionalization of capital collateral representation serves three purposes: specialization, centralization, and continuity. It helps in training future death penalty qualified attorneys, in maintaining an "institutional memory" of the historical development of the law, in developing a central registry of postconviction capital cases, and in assuring whenever possible that the same lawyer is assigned to a case throughout the postconviction process. CCR thus appears to me to be a more efficient means of representing capital defendants than a private Bar model.

Although I briefly explored the long-term scenario of using CCR as a clearinghouse to support the privatization of capital collateral representation, for the reasons cited above, combined with the recommendation of the Cox Report that federal VLRC–type programs be reconfigured to provide CCR type direct representation, I have concluded that neither privatization nor a VLRC–type program are workable long-term solutions.

### 4. Clemency

CCR specifically brought to my attention two death penalty cases (Carlis Lindsey and Samuel Pettit) that raise the issue of the expanded use of the clemency process. CCR contends that Mr. Lindsey, who is 72 years old, likely will die of natural causes before the expiration of his collateral appeals. CCR contends that Mr. Pettit, who is suffering from a degenerative brain disease, also will likely die of natural causes before the expiration of his collateral appeals. CCR cites these two cases as examples of situations where the selective use of clemency might *slightly* ease the volume of death penalty cases while still serving the interests of justice.

Generally, the early initiation of clemency review may create the possibility that *some*

*cases* can be removed from the system by imposing life imprisonment without the possibility of parole where there is an indication that the defendant is mentally ill, has received a life recommendation from the jury, or otherwise may deserve clemency. There is certainly merit in discussing this approach with the Governor, although I do *not* believe it will result in any significant reduction of CCR's cases.

### III. CONCLUSION AND RECOMMENDATIONS

Based on the foregoing, it is my belief that CCR should be required to assign counsel in the 40 undesignated cases on an incremental 3.850 schedule. I also strongly believe that the Legislature should, at a minimum, provide funding to CCR consistent with the Governor's recommended budget. Additional funding should also be provided for CCR branch offices and for CCR to hire mid-level experienced lawyers. The Legislature should also provide separate funding for a VLRC–type program—within CCR—to provide support to the 41 private lawyers formerly assisted by VLRC.

In considering the detailed recommendations outlined below, I think it is important to bear in mind that state and federal postconviction review plays an important role in ensuring that the legal process which results in a death sentence is free from legal and factual error. The fact that "death is different" cannot be overlooked. Providing *competent* counsel to represent death-sentenced individuals in postconviction proceedings is a necessary part of assuring a fair, prompt, and reliable outcome. The legislative goal of finality can only be achieved if death-sentenced inmates are afforded due process of law and effective counsel. The continued operation of CCR is, in my view, the best way to achieve this finality.[17]

In a perfect world, CCR attorneys would have only 4 cases each and unlimited resources to pursue investigation and defense. In reality, there is a finite availability of

---

17. CCR–type programs have been recognized across the country as the most efficient and cost-effective means of providing representation to death row inmates. Since its inception in 1985,

CCR has been responsible for reducing death sentences to life or better in 23 cases, compared to 19 executions during the same 10–year period.

funds, and CCR must make choices, just like most private lawyers must make choices, as to which avenues of defense to pursue and how many attorney and investigator hours can be devoted to a particular issue. It does not violate the rules of professional responsibility for a lawyer to make such choices based on his or her experience. The purpose of the 1 year filing deadline imposed by Rule 3.851 is to help provide finality in carrying out the death penalty; this finality and closure is deserved by society in general and by the families of victims in particular. CCR's job is to keep the process moving, not to stand in its way. Ultimately, it is the obligation of the Courts—not the lawyers at CCR—to determine whether a death-sentenced defendant has received a fair trial and a constitutionally proportionate sentence.

Although I cannot provide a detailed formula for CCR to follow in deciding how to allocate its resources, I do believe that the United States Supreme Court's jurisprudence provides sufficient guidance by requiring that errors raised on collateral review must be substantial enough to have changed the outcome of the trial. *E.g., United States v. Bagley,* 473 U.S. 667, 682 (1985) ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *Strickland v. Washington,* 466 U.S. 668, 687 (1984) ("[T]he defendant must show that the deficient performance prejudiced the defense."). CCR's attorneys do not have the luxury to pursue every lead *ad infinitum.* They must choose to pursue only those leads that have a reasonable probability of showing material prejudice to the defendant and to the outcome of the trial.

In light of this requirement that CCR must ration its funds within the bounds of finite resources, but also realizing that CCR has performed, in good faith, a vital service in assuring that the death penalty is effectuated consistent with the dictates of basic fairness and constitutional due process, I make the following 6 recommendations.

*RECOMMENDATION # 1*

CCR should be required by Court order to designate counsel in all 40 undesignated cases on an incremental 3.850 schedule that allows the full 11 months for CCR to file 3.850 motions in each individual case. Assuming the Court agrees with this primary recommendation, CCR's pending motion for rehearing and clarification would presumably be denied.

It is recommended that CCR should designate counsel from its existing staff of lawyers to incorporate the oldest 20 of the 40 impasse cases. CCR should designate attorneys in these 20 cases over a several month period, to be set by the Court, with at least 4 cases designated each month. The remaining 20 cases should be incorporated as part of the 6 new lawyers that CCR will be authorized to hire pursuant to the Governor's recommended budget. Each of these lawyers should be qualified to initially handle at least 4 new cases. I recommend that CCR be required to designate counsel in these cases over a several month period beginning in September or October 1996.

This incremental schedule recognizes that CCR has already gained an approximate 10–month respite from accepting new cases as a result of the current impasse, and also allows time for CCR to establish branch offices, to hire additional experienced staff counsel, and for the Court to create a new rule of discovery in 3.850 proceedings. The Supreme Court should recognize that the successful implementation of this recommendation depends in large part on the occurrence of the following:

1. Legislative appropriation as of July 1, 1996, of the necessary funds to fulfill the Governor's 1996–97 Recommended Budget;

2. Legislative appropriation of additional funds to allow CCR to hire mid-level defense attorneys with 2 years of criminal experience as required by the statute; and

3. Legislative appropriation of supplemental "start up" funds for CCR to open branch offices.

### RECOMMENDATION # 2

The Legislature should provide additional, separate funding in the range of $750,000 to $1 million, to create a VLRC–type program within CCR to handle the 41 former VLRC cases. This may be accomplished in one of two ways: either a direct appropriation to CCR, or, an appropriation to a separate trust fund administered by a neutral gatekeeper, such as a retired Supreme Court Justice. There are several reasons for this recommendation. First, although it is illogical to continue to fund *two* collateral capital attorney organizations, it is clear that CCR is "conflicted out" of 24 of the current death penalty representations (19 conflict cases assigned originally to VLRC plus 5 unassigned conflict cases). Accordingly, it is necessary to maintain a system of support to private volunteer counsel. (CCR will need to "chinese wall" these conflict cases.) Second, although it might be possible to incorporate the remaining 22 nonconflict cases into CCR's workload, this would not be feasible without yet additional funding. Third, there is a benefit to maintaining some active participation of the private Bar in death penalty cases to educate lawyers and to maintain general public awareness.

### RECOMMENDATION # 3

Because of the voluminous and oftentimes unnecessary tangential civil litigation and lack of statewide consistency relating to the determination of Chapter 119 public records requests in capital collateral proceedings, the Court should *expedite* the creation of a new rule of criminal procedure to facilitate CCR's access to public records from state attorneys and state and local law enforcement agencies. The new rule should contain expedited time schedules for requests, responses, objections, and for the resolution of disputes by the trial judges that eventually will rule on the 3.850 motions. The goal of the new rule should be to expedite CCR's access to Chapter 119 information so that it can be reviewed by CCR in time to be incorporated in the original 3.850 motion. This should eliminate a significant portion of the delay in ruling on 3.850 motions that has occurred because of tangential civil litigation and the apparent inability of CCR to file a *complete* 3.850 motion within the 1 year time period.

### RECOMMENDATION # 4

CCR should list, *without argument,* those issues that are clearly not dispositive but that CCR believes must be preserved as a matter of procedural formality. This perhaps could be facilitated by the Court's adoption of another new Rule.

The Supreme Court should place CCR staff attorneys on notice that it will no longer tolerate anything but complete candor before state trial courts and the Florida Supreme Court and total compliance with the Florida Rules of Professional Responsibility. In particular, the failure to advise all courts of known adverse precedents on particular issues should result in disciplinary investigation and action by the Florida Bar.

### RECOMMENDATION # 5

Because part of the delay in prosecuting 3.850 motions occurs at the trial court level, the Florida Supreme Court should adopt a rule of judicial administration requiring expedited processing of 3.850 motions and hearings. The rule should also provide that the same judge who tried the case—if still available—should decide 3.850 motions in capital cases, even if the judge no longer sits in the circuit court's criminal division. In addition, the Court should follow through with the Overton Committee Report's recommendation of requesting circuit court clerks to assign one person the responsibility of administering 3.850 cases. Finally, the Judicial College should prepare a concise handbook for trial judges in capital collateral proceedings to assist them in sorting through the major jurisprudential issues.

### RECOMMENDATION # 6

The Legislature should require CCR staff attorneys and investigators to keep contemporaneous time records that can be converted into computer-generated time reports. This will substantially assist in evaluating CCR's workload in the future for funding purposes. In particular, CCR should be directed to divide individual cases into separate matter numbers corresponding to the various levels of collateral proceedings. For example, in the case of Defendant Smith, CCR's

time spent preparing and arguing the 3.850 motion at the trial level should be recorded under matter number 001, the preparation and argument of the 3.850 appeal to the Florida Supreme Court should be matter number 002, federal habeas representation at the federal district court level should be matter number 003, the habeas appeal to the Eleventh Circuit should be matter number 004, certiorari review to the United States Supreme Court should be 005, and death warrant proceedings should be 006. In addition, separate matter numbers should be maintained for related civil litigation that CCR files, although it is my hope that the new Rule on Chapter 119 compliance will significantly reduce or eliminate the "related civil litigation."

\* \* \*

In making these recommendations, I hope that I have been able to structure and suggest a workable solution to an obviously sensitive and difficult problem. Please feel free to call if I, or my firm, can be of further assistance.

Respectfully submitted,
/s/ Robert L. Shevin
Robert L. Shevin